UNITED STATES of America, Appellee,

v.

Lawrence Gilbert CHESHER, Appellant.

No. 80–1011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 9, 1981.

Decided June 9, 1982.

Doron Weinberg, San Francisco, Cal., argued, for appellant; Larson, Weinberg & Harris, San Francisco, Cal., on brief.

Sanford Svetcov, Chief Asst. U. S. Atty., San Francisco, Cal., argued, for appellee; Richard Dondero, Asst. U. S. Atty., San Francisco, Cal., on brief.

Before GOODWIN and NORRIS, Circuit Judges, and McNICHOLS,* District Judge.

NORRIS, Circuit Judge:

Appellant Lawrence Chesher was convicted on stipulated facts of having manufactured methamphetamine, a Schedule II non-narcotic controlled substance, in violation of 21 U.S.C. § 841(a)(1).

Chesher challenges the district court's denial of his timely motion to suppress evidence as illegally obtained. He argues that the drug laboratory seized in his residence should have been suppressed because it was neither seized pursuant to a valid warrant nor validly seized in plain view.

Chesher contends that an "indicia warrant" authorizing officers to search for any indicia of membership in or association with the Hells Angels Motorcycle Club, was invalid under both the First and Fourth Amendments to the United States Constitution. He also contends that a second warrant, obtained by the officers after they discovered the drug laboratory, was invalid.

I.

On June 12, 1979, an indictment was filed in the United States District Court for the Northern District of California, charging Chesher, along with thirty-one other defendants, with violating Title IX of the Organized Crime Control Act of 1970. This title, commonly known as The Racketeer Influenced and Corrupt Organizations Act (RICO), prohibits conducting or participating in the conduct of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c). The indictment identified the RICO "enterprise" as the Hells Angels Motorcycle Club.

On the day after the indictment was filed, federal officers obtained indicia warrants authorizing a search of each appellant's residence and seizure of any indicia of membership in or association with the Hells Angels Motorcycle Club. In addition to the indicia warrants, the searching officers possessed arrest and *Prescott* warrants[1] for each appellant.

During the course of the search of Chesher's residence, officers discovered and seized a laboratory used for the manufacture of methamphetamine, and a small quantity of methamphetamine. An additional count charging Chesher with violating 21 U.S.C. § 841(a)(1) was then added to the June 12, 1979 indictment.

Chesher moved to suppress all of the evidence seized in the search of his residence. After several evidentiary hearings Judge Conti denied the suppression motion. Pursuant to a motion made by the government, the RICO charges were dismissed by the court, leaving only the drug manufacture charge against Chesher. Chesher waived his right to trial by jury on the remaining count against him, and agreed to submit the issue of guilt to the court on a written stipulation of facts.

On November 19, 1979, Judge Conti found Chesher guilty as charged. Chesher was sentenced to five years imprisonment and fined $5,000.00. He is currently serving his sentence in a federal correctional institution.

II.

The facts concerning the search are not in dispute. On the evening of June 13, 1979, a team of federal agents executed arrest and search warrants at the home in which Chesher was living. The agents approached the home at approximately 8:30 p. m., and were admitted to the home by Chesher's mother. During the "sweep search" of the home pursuant to the *Prescott* warrant, one of the agents observed a laboratory apparatus in a back room and summoned the lead agent, Stewart. As he neared the back room, Agent Stewart detected the smell of acetone, a chemical which, from his experience as a drug agent,

---

* The Honorable Robert J. McNichols, United States District Judge for the Eastern District of Washington, sitting by designation.

1. A *Prescott* warrant authorizes the search of a home for a person named in an accompanying arrest warrant. *United States v. Prescott*, 581 F.2d 1343 (9th Cir. 1978).

he associated with the manufacture of methamphetamine. Stewart looked into the room, entered it, and turned on the light in order to confirm his belief that the room housed a laboratory. He saw that all of the walls of the room were covered with plastic, that an exhaust fan was installed in the doorway, and that there was glassware typical of a drug laboratory on each table in the room.

Agent Stewart then dispatched Agent Williams to obtain a warrant for the search and seizure of the laboratory and ordered that the laboratory not be touched until then. The search under the indicia warrant then began. While it was underway, Chesher arrived and was arrested without incident. Shortly after midnight, with the indicia search still in progress, Agent Williams returned with a supplemental warrant for the search and seizure of the laboratory. The agents immediately took possession of the laboratory.

## A. Seizure of the Drug Laboratory

Chesher contends that the evidence of the drug laboratory should have been suppressed because it was seized in violation of the Fourth Amendment. First, Chesher argues that the seizure cannot be justified as a "plain view" seizure. Second, he argues that the supplemental search warrant was invalid for several reasons: failure of the underlying affidavit to allege sufficient facts to provide probable cause, failure of the affidavit to allege a federal offense, and failure of the warrant to authorize nighttime service.

■ The district court found that the laboratory was seized in plain view. The court also held that the supplemental warrant, though not needed, was valid. The facts of the discovery and seizure are not in dispute. The sole issue is whether these facts are sufficient as a matter of law under *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) to justify a warrantless seizure. We hold that the government has met its burden of showing a valid plain view seizure of the laboratory. Accordingly, we do not reach the issues relating to the supplemental warrant.

■ The plurality opinion in *Coolidge* sets forth three requirements for a valid plain view seizure. First, there must be a legitimate prior justification for the officer's presence. *Id.* at 466, 91 S.Ct. at 2038. Second, the discovery must be "inadvertent." *Id.* at 469, 91 S.Ct. at 2040. Finally, it must be "immediately apparent to the police that they have evidence before them." *Id.* at 466, 91 S.Ct. at 2038.

Chesher argues that the government has failed to meet its burden in establishing the third requirement of *Coolidge*—that the incriminating nature of the item seized be immediately apparent to the officer. First, he contends, acetone (the chemical smelled by Agent Stewart as he approached the back room) has lawful uses. Second, he contends, even Stewart's closer inspection of the glassware and equipment disclosed only that it was a laboratory of some sort, not whether it existed for legal or illegal purposes.

■ We reject both of Chesher's arguments. Although the Supreme Court has given little guidance as to what the third *Coolidge* requirement specifically requires,[2]

---

**2.** Justice Stewart, author of the plurality opinion in *Coolidge*, offered no clearer explanation of the immediate apparency requirement than citation to his concurring opinion in *Stanley v. Georgia*, 394 U.S. 557, 569–72, 89 S.Ct. 1243, 1250–1251, 22 L.Ed.2d 542 (1969). *Coolidge*, 403 U.S. at 466–67, 91 S.Ct. at 2038. In *Stanley*, Justice Stewart would have found unlawful, as falling outside the realm of immediate apparency, a seizure of film reels discovered during a search pursuant to a search warrant for evidence of bookmaking, where the police

had to project the films and view them in order to conclude that they were obscene.

The only other discussion of the "immediate apparency" requirement in Supreme Court opinions has been in two dissents by Justice Douglas to denials of petitions for a writ of certiorari. *See United States v. Ochs*, 595 F.2d 1247, 1257 n.8 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). In *Sedillo v. United States*, 419 U.S. 947, 95 S.Ct. 211, 42 L.Ed.2d 168 (1974), Justice Douglas questioned the finding of plain view where the

we know of no authority suggesting that *Coolidge* requires that an object be conclusively incriminating. We agree with the Second Circuit that "under the plain view doctrine ... the incriminating nature of an object is generally deemed 'immediately apparent' where police have probable cause to believe it is evidence of crime." *United States v. Ochs*, 595 F.2d 1247, 1258 (2d Cir. 1979). This is consistent with the rationale for allowing plain view seizures. If the benefit of permitting warrantless seizure in narrow circumstances is avoidance of the inconvenience of obtaining a warrant for inadvertently discovered evidence, *Coolidge*, 403 U.S. at 467–68, 91 S.Ct. at 2038–2039, it follows that an object's possible relevance as evidence need not be shown to any greater degree than would be sufficient to obtain a warrant were one sought. We hold that

if facts sufficient to provide probable cause to believe an object is incriminating are immediately apparent to the officer, the third *Coolidge* requirement is met.

We conclude that the smell of acetone, the appearance of the room in which the laboratory was housed, and the laboratory glassware itself, provided Agent Stewart with probable cause to believe that the laboratory was evidence of a crime. The district court's decision to admit the evidence of the drug laboratory must therefore be upheld.

### B. Sufficiency of the Evidence

■■■ Chesher argues that the evidence against him was insufficient to support the district court's finding of guilt. In considering this claim, we are limited to a

police officer discovered that the envelope in Sedillo's possession contained a forged Treasury check only after he seized it from the pocket of the petitioner. In *Gentile v. United States*, 419 U.S. 979, 980 n.1, 95 S.Ct. 241 n.1, 42 L.Ed.2d 191 (1974), Justice Douglas likewise questioned the application of plain view where the stolen check was almost wholly obscured by a piece of clothing when viewed by the officer. In each instance, Justice Douglas argued that the incriminating nature of the object was not immediately apparent and did not become apparent until after it was illegitimately seized by the police.

Courts that have considered the third *Coolidge* requirement have upheld seizures under the plain view exception despite something less than instantaneous recognition of the object's relevance as evidence of crime. In each case, some perusal, usually brief, was necessary before that judgment was made by the police. *See, e.g., United States v. Ochs, supra*, 595 F.2d at 1257 n.8 (and the cases cited therein). This circuit has permitted some limited inspection to determine whether an inadvertently discovered object is incriminating. *See United States v. Sedillo*, 496 F.2d 151 (9th Cir.), *cert. denied*, 419 U.S. 947, 95 S.Ct. 211, 42 L.Ed.2d 168 (1974) (facts discussed *supra*); *United States v. Damitz*, 495 F.2d 50 (9th Cir. 1974) (warrantless seizure of small notebook which, upon examination, was found to contain a series of numbers later shown to correspond to the weight in grams of the bricks of marijuana seized pursuant to a warrant, held valid under plain view doctrine).

Two other aspects of the seizure deserve brief mention. Agent Stewart turned on the light in the back room in order to see the laboratory more clearly. It is clear that this does not mean that the laboratory was not in

plain view. This circuit held that the need for artificial illumination of an area or object does not preclude a valid plain view seizure. *See, e.g., United States v. Hood*, 493 F.2d 677, 680 (9th Cir.), *cert. denied*, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974) (objects in automobile were in plain view despite use of flashlight by police to see into the automobile); *United States v. Walling*, 486 F.2d 229, 236 (9th Cir. 1973) (same facts).

Chesher also points out that Agent Stewart did not seize the laboratory immediately, but rather obtained the supplemental warrant first. Chesher suggests that this indicates that Stewart did not believe he could validly seize the laboratory without a warrant. The implication is that the seizure cannot be validated under the plain view exception if Stewart thought that the seizure was pursuant to the warrant. We know of no such legal doctrine. A major purpose of the exclusionary rule is to encourage law enforcement personnel to follow the mandates of the Fourth Amendment. Here the agent, commendably, went to the inconvenience of obtaining the supplemental warrant notwithstanding his inadvertent discovery, in order to make certain that the seizure would be legal. It would be wholly counterproductive to the deterrent function of the exclusionary rule for this court, in effect, to penalize the officer for being careful and cautious. Neither the delay in time between the initial discovery of the laboratory and its ultimate seizure, nor the obtaining of the warrant in the interim, nor the agent's belief that the eventual seizure was pursuant to the supplemental warrant, weighs against finding a valid plain view seizure where the *Coolidge* requirements otherwise are met.

determination of whether the stipulated facts present substantial evidence of guilt beyond a reasonable doubt. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Jacobo-Gil*, 474 F.2d 1213, 1214 (9th Cir. 1973).[3]

The stipulation contained the following facts. Chesher lived in his mother's house. In the back room of the house was a laboratory used for the manufacture of methamphetamine. The door to the back room had been fitted with a latch and padlock, although the door was unlocked at the time of the search. When Chesher was arrested at the house, he had in his possession a key which fit the padlock. Two of Chesher's fingerprints were found on a piece of equipment in the laboratory. Several of the handwritten papers in the room, pertaining to the production of methamphetamine, contained references to individuals apparently involved in the use of the laboratory. None of these documents contained references to Chesher, nor were any of the documents in Chesher's handwriting. In the bedroom occupied by Chesher, the agents found small amounts of methamphetamine "consistent with personal use."

The lawfulness of the entry and the arrest, together with our holding that the drug laboratory was seized in plain view, justifies the admission of all the above evidence except the methamphetamine found in Chesher's bedroom. This latter evidence was discovered and seized during the execution of the indicia warrant. Were the evidence from the drug laboratory alone sufficient to support Chesher's conviction, we could disregard the "bedroom evidence" and affirm the conviction without considering the challenges to the indicia warrant. We hold, however, that it does not. Rather, we find that the bedroom evidence is determinative of Chesher's challenge to the sufficiency of the evidence. Without it, there is insufficient evidence to convict him of the manufacture of methamphetamine. The house itself belonged not to Chesher but to his mother, and a third adult lived there as well. As noted, none of the written materials in the laboratory were written by Chesher, nor did they refer to him. The circumstantial evidence of the fingerprints on the equipment and the key in Chesher's possession are incriminating, but without the additional evidence of the methamphetamine in Chesher's bedroom a finding of guilt beyond a reasonable doubt is unsupported by substantial evidence. We hold that with the incremental bedroom evidence there is substantial evidence that Chesher was involved in the manufacture. Because we view the bedroom evidence as determinative of the issue of the sufficiency of the evidence, we are required to consider Chesher's claim that the bedroom evidence

---

3. Rule 52(a) of the Federal Rules of Civil Procedure states that findings of fact shall not be set aside unless clearly erroneous. As *Glasser* and *Jacobo-Gil* hold, the standard of review of a criminal conviction claimed not to be supported by sufficient evidence is whether the record shows "substantial evidence" of guilt beyond a reasonable doubt. Both standards clearly involve great deference to the findings of the trial court, rather than *de novo* review of the evidence, on the basis of the trial judge's opportunity to view the demeanor of the witnesses and thus judge their credibility. This is recognized explicitly in Rule 52(a)'s command that "due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."

A major dispute has been waged over whether a reviewing court should defer to the trial court where there is no live testimony, such as the case before us where all facts are stipulated, or where the evidence is entirely documentary. In *Orvis y. Higgens*, 180 F.2d 537 (2d Cir. 1950), Judge Frank contended that direct observation of witnesses should be the controlling criterion as to whether a trial court's findings are to be given weight. "If [the trial judge] decides a fact issue on written evidence alone, we are able as he to determine credibility, and so we may disregard his finding." *Id.* at 539. This circuit, however, has accepted the competing view that deference must be afforded even where the trial is on depositions or stipulated facts. *See Lundgren v. Freeman*, 307 F.2d 104, 113–115 (9th Cir. 1962). *Lundgren*, in which this court discussed the issue extensively, remains the law of this circuit. *See, e.g., United States v. Alaska Steamship Co.*, 491 F.2d 1147, 1151 (9th Cir. 1974); *United States v. Ironworkers Local 86*, 443 F.2d 544, 549 (9th Cir. 1971). Although we recognize that *Lundgren* was a civil case, we see no reason for a different rule in criminal cases.

is inadmissible because the indicia warrant, under which it was seized, was invalid.

## C. *The Indicia Warrant*

Chesher makes several arguments against the admission of the evidence seized under the indicia warrant. First, he contends that the affidavit in support of the indicia warrant failed to provide probable cause. Second, he contends that the district court improperly refused to allow an evidentiary hearing on the issue whether the affidavit was materially based on statements which were deliberately false or made with reckless disregard for the truth. Finally, he contends that the indicia warrant is invalid as a general warrant in violation of the Fourth Amendment, or as an infringement of his First Amendment right of free association.

### 1. *Probable Cause*

■ Chesher argues that Agent Bertolani's affidavit in support of the indicia warrant failed to establish probable cause to believe that the evidence sought would be found. We note, preliminarily, that we must read the warrant affidavit in a common sense and realistic manner, *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965), and pay substantial deference to the magistrate's determination that probable cause existed, *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964). Whether the warrant affidavit is sufficient to provide probable cause for the magistrate to believe that Chesher was a member of Hells Angels at the time the indicia warrant issued is a question of law. *See Ker v. California*, 374 U.S. 23, 33–34, 83 S.Ct. 1623, 1629–1630, 10 L.Ed.2d 726 (1963); *United States v. One Twin Engine Beech Airplane*, 533 F.2d 1106, 1108 (9th Cir. 1976).

The focus of Chesher's argument is the statement in Agent Bertolani's affidavit that "as a result of my experience and conversations with CRI's [confidential and reliable informants] 1, 2, and 3, I know that LAWRENCE GILBERT CHESHER is a member of the HELLS ANGELS MOTOR-CYCLE CLUB." Chesher first argues that the statement was merely a conclusion by the agent and, as such, was insufficient to allow the magistrate to independently evaluate the reliability of the informants' information.

■ Chesher is correct that a warrant affidavit based in part on hearsay information must provide enough of the circumstances from which the informant drew his conclusions to allow the magistrate to verify the conclusions and confirm that they are not based merely on rumor or reputation. *Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1968); *United States v. Perez-Esparza*, 609 F.2d 1284, 1287 (9th Cir. 1979); *United States v. Larkin*, 510 F.2d 13, 14 (9th Cir. 1974).

■ It is unclear from the face of the affidavit whether Bertolani was relying exclusively on the hearsay information from the informants, or had personal knowledge based on his own experience as well. Heeding the guidelines of *Ventresca* and *Aguilar* mentioned above, we conclude that Bertolani's statement was made from personal knowledge. Viewed as such, the affidavit is adequate to support the magistrate's finding of probable cause.[4] The somewhat conclusory nature of the statement, while hardly exemplary, is not fatal, because the magistrate is entitled to give great weight to the sworn statements of a government agent, based on personal knowledge, as contrasted with the weight he may give to statements based on hearsay information from non-governmental informants.

The issue of probable cause must be distinguished from both the issue of the warrant's possible unconstitutionality as a general warrant and the issue of whether the affidavit was based on an intentionally or

---

**4.** Because we hold that Bertolani's statement was based on personal knowledge, we need not decide whether the warrant affidavit would be sufficient to provide probable cause were the statement instead based exclusively on the hearsay conclusions of the informants.

recklessly false statement by Agent Bertolani. That Chesher was not, in fact, a member of the Club as of the date of the affidavit [5] goes to the latter issue, not the question of whether the affidavit, on its face, supplied probable cause. We agree with the district court that the affidavit supplied probable cause for the magistrate to believe Chesher was a Club member at the time the indicia warrant was issued.

### 2. The Denial of a Franks Hearing

Chesher contends the district court erred in refusing to allow an evidentiary hearing to determine whether the Bertolani affidavit was materially based on an intentionally or recklessly false statement. This claim stems from the same portion of the affidavit that we quoted above—Agent Bertolani's statement that he knew Chesher to be currently a member of the Hells Angels.

In Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that in certain narrow circumstances a defendant may go beyond the facial sufficiency of an affidavit supporting a warrant, and challenge the truthfulness of factual statements made therein. The rationale behind the Franks rule is clear:

> Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment.

Id. at 165, 98 S.Ct. at 2681 (citations omitted).

The Court was careful, however, to avoid creating a rule which would make evidentiary hearings into an affiant's veracity commonplace, obtainable on a bare allegation of bad faith. It crafted, therefore, a rule of very limited scope. Under Franks, a defendant must satisfy a two-pronged test to be entitled to an evidentiary hearing.

First, he must make a "substantial preliminary showing" that the affidavit contained actual falsity, and that the falsity either was deliberate or resulted from reckless disregard for the truth. These allegations cannot be merely conclusory; rather, they must be accompanied by a detailed offer of proof. 438 U.S. at 171, 98 S.Ct. at 2684; see also United States v. Young Buffalo, 591 F.2d 506, 509 (9th Cir.), cert. denied, 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979). Second, the court must determine that the challenged statement is necessary to a finding of probable cause, i.e., that its excision would leave the affidavit with insufficient content to establish probable cause. Franks, 438 U.S. at 171–72, 98 S.Ct. at 2684; Young Buffalo, 591 F.2d at 509.

### (a) The "substantial preliminary showing"

The first component of the first prong of the Franks test—a preliminary showing of actual falsity in the affidavit—is satisfied here by the government's concession that Agent Bertolani's statement that Chesher was a Club member as of the date of the affidavit, June 13, 1979, was false. We must therefore determine, by examining the evidence in the record before us, whether the second component of the first prong of Franks has been satisfied, i.e., whether Chesher has made a substantial showing that Bertolani's affidavit statement was intentionally false or made with reckless disregard for the truth. We examine four items of evidence which tend to corroborate Chesher's charge that the statement was intentionally or recklessly false.

The first item of evidence is the sworn statement by Chesher that anyone with the close knowledge of the Club claimed by Bertolani would have known that Chesher had been expelled in 1975.[6] Chesher's as-

---

**5.** The government concedes in its brief that Bertolani's affidavit statement that he knew Chesher currently to be a member of Hells Angels is false. See Brief for Appellee at 50.

**6.** In support of his motion to suppress, Chesher filed an affidavit with the district court in which he squarely contradicts the statement in Agent Bertolani's warrant affidavit that Berto-

sertion tends to be corroborated by the fact that an agent of the California Bureau of Narcotics, Van Ramm, did gain knowledge in 1975 that Chesher was no longer a member, as evidenced by his 1975 report. The fact that Van Ramm reported that Chesher was no longer a member within months after the date on which Chesher claims that he was expelled from the Club indicates that such information not only was true, but that it quickly was available to investigative agents, as Chesher claims. Yet Bertolani claims to have had no knowledge of it almost four years later.

The second item of evidence is directly related to this four-year time lapse. Bertolani based his assertion of current knowledge on information that was patently stale. One informant had four-year old information, another had eight-year old information, and the third informant professed no knowledge at all of Chesher's current membership status.[7] The use of information this out of date as a basis for an expression of Bertolani's current belief tends to support a claim of recklessness.

The third item of evidence is the failure of Bertolani to discover the Van Ramm report, which would have informed him that Chesher's membership in the Hells Angels Motorcycle Club had terminated in 1975. In his warrant affidavit of June 13, 1979, Bertolani stated that he had investigated the Club for twelve years, had been an undercover agent for more than one year, had participated in a 1978 conference of investigators of motorcycle clubs, and had spoken with "numerous local, county, state, and federal law enforcement officers, including members of the Royal Canadian Mounted Police, regarding criminal activities involving members and associates of the HELLS ANGELS MOTORCYCLE CLUB." The unexplained failure of an agent investigating Hells Angels in California, with these extensive contacts with other investigators, to discover, for almost four years, a report written by an agent with the California Bureau of Narcotics, also tends to support a claim of recklessness.

The fourth item of evidence of recklessness or deliberate falsehood is the offer of proof by Chesher that Bertolani spoke to Agent Van Ramm himself on several occasions subsequent to the release of the Van Ramm report. This item, if proven, may support an inference of recklessness by Bertolani in not discovering the Van Ramm report.

Only two items of evidence counter Chesher's charge of recklessness or deliberate falsehood. First, Bertolani alleges that the extreme secrecy that surrounds the Club makes it very difficult to obtain up to date information about membership status. The Van Ramm report, which reported Chesher's departure from the Club soon after it occurred in 1975, tends to weaken the general claim made by Bertolani. It is further weakened by a claim which, though unsubstantiated by Chesher in the record, presumably would be one of the points explored at a *Franks* hearing should one occur: that one of the informants upon whom Bertolani relied for the information in his warrant affidavit was also one of the informants who had informed Van Ramm earlier of Chesher's expulsion.

The second item of evidence in support of Bertolani's assertion of good faith and non-recklessness is his uncorroborated claim that in the conversations between him and Van Ramm, neither the Van Ramm report nor Chesher was discussed. Whatever light

---

lani knew Chesher to be a member of the Hells Angels as of June 13, 1979, the date of the warrant affidavit. In the affidavit, Chesher denies any association with the Hells Angels since 1975, when he claims he was publicly expelled from the Club for nonparticipation and required to divest himself of all Club indicia. So strict was the requirement of divestment, Chesher claims, that he had to obliterate from his arm a Hells Angels tattoo.

7. Bertolani acknowledges that his actual information was as follows:
   (1) CRI 1 indicated that Chesher was a member during the period 1968–1971;
   (2) CRI 2 indicated that Chesher was a member as of mid-1975;
   (3) CRI 3 indicated that Chesher had been a member at one time, but that he was not aware of Chesher's present status.

this evidence may shed on the issue whether the false statement was deliberately made, it plainly does not counter Chesher's claim of recklessness. Chesher argues that the fact that the conversations took place—even assuming that neither Chesher nor the report was discussed—tends to support an inference that Bertolani acted recklessly in failing to discover the Van Ramm report.

We conclude that Chesher's affidavit, the Van Ramm report, the conversations between Van Ramm and Bertolani, and the staleness of the information relied on in the warrant affidavit, together constitute the required "substantial preliminary showing" of deliberate or reckless falsity. Clear proof is not required—for it is at the evidentiary hearing itself that the defendant, aided by live testimony and cross-examination, must prove actual recklessness or deliberate falsity.[8] To be entitled to an evidentiary hearing, however, Chesher must also meet the second prong of the *Franks* test.

#### (b) *Materiality to the finding of probable cause*

Chesher's substantial preliminary showing of recklessness or deliberate falsity is of no consequence, under *Franks*, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." 438 U.S. at 171–72, 98 S.Ct. at 2684. We must determine, therefore, whether probable cause exists independent of Bertolani's statement in his warrant affidavit that he knew Chesher to be a Club member.

The warrant affidavit contained voluminous detail about the indicia customarily kept by members and associates of the Club. Only two statements other than the one alleged to be recklessly or deliberately false, however, relate to Chesher's relationship with the Club. First, the affidavit states that a 1973 investigative report identified Chesher as a Club member. Second, the affidavit states that Chesher had been linked to the Club in the RICO indictments returned only the day before the affidavit was made.

■ The district court, in denying the *Franks* hearing, held that "the statement that Chesher was known to be a present member was, although very relevant, not critical to the finding of probable cause." We cannot agree. A showing of probable cause requires that the affidavit provide sufficient facts and circumstances to permit a reasonable person to conclude independently that Hells Angels indicia was likely to be found in Chesher's home. *See United States v. Moreno*, 569 F.2d 1049, 1052–53 (9th Cir.), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1615, 56 L.Ed.2d 64 (1978). The link to such a conclusion, quite clearly, is a showing of probable cause to believe that Chesher was still a member or associate of the Club. The statements simply do not provide this. The averment that Chesher was identified as a Club member in a 1973 investigative report relies on information too old to be of any real value to the magistrate in 1979. An affidavit in support of a search warrant

---

**8.** Justice Blackmun's opinion for the Court in *Franks* summarized the proof requirement:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. 438 U.S. at 171, 98 S.Ct. at 2684.
> We do not think that under our reading of the first prong of the *Franks* test a flood of evidentiary hearings will result. Those that will occur are compelled, we think, by the considerations which underlie *Franks*.

"must speak as of the time of the issue of that warrant." *Sgro v. United States*, 287 U.S. 206, 211, 53 S.Ct. 138, 140, 77 L.Ed. 260 (1932).

■ Nor can a finding of probable cause be grounded on the affidavit's recitation of the RICO indictment.[9] The nature of the RICO indictment makes it an insufficient basis for a conclusion by a magistrate that there is probable cause to search the home of the indicted individual for indicia of association with the RICO enterprise.[10] Probable cause to indict for RICO violations is quite different from probable cause to believe that indicia will be found in the indicted individual's home; the two conclusions depend on entirely different considerations. Probable cause to search Chesher's home, as we have noted, requires evidence of his current membership in or association with the Hells Angels. The RICO indictment provides no such thing. A person may be indicted under RICO if he is found by a grand jury to have committed any two predicate acts of racketeering, in connection with the conduct of the affairs of an enterprise, within a ten year period, provided that the last act occurred within the five-year federal statute of limitations for non-capital offenses, 18 U.S.C. § 3282. *See United States v. Field*, 432 F.Supp. 55, 59–60 (D.C.N.Y.1977), *aff'd. mem.*, 578 F.2d 1371 (2d Cir.), *cert. dism'd.*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). Plainly, a RICO indictment could issue against a person who had discontinued all association with the named enterprise almost five years before. This is precisely what Chesher alleges occurred here. Without revealing the evidence upon which the grand jury based its indictment, the mere recitation in the affidavit that a RICO indictment had been issued gave the magistrate no basis for concluding that there was any evidence of current association, the prerequisite to finding probable cause to search Chesher's home for indicia.[11]

We find that if the critical allegation of Bertolani's knowledge of Chesher's membership is set aside, the remaining content of the affidavit is insufficient to support a finding of probable cause. Under *Franks*, Chesher is therefore entitled to an evidentiary hearing on the issue whether Bertolani's statement that he knew Chesher to be a

9. Our holding here is limited to the facts before us—the particularized nature of the RICO indictments. As we said in *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970), "it cannot follow in all cases, simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence. If that were so, there would be no reason to distinguish search warrants from arrest warrants, and cases like *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) would make little sense." The function of the magistrate in the warrant process is to independently assess the facts supporting the affiant's conclusion that the evidence sought is likely to be found in the place identified. *Id.* By basing his conclusion on an indictment alone, a magistrate is merely accepting the conclusions of another body, not exercising independent judgment. We do not decide the question whether the grand jury is sufficiently neutral and independent that a magistrate *ever* can issue a search warrant upon no more information than the fact that the person whose home is sought to be searched has been indicted by a grand jury. The alternative, of course, is to require that a warrant affidavit disclose enough of the evidence that was presented to the grand jury to allow the magistrate to exercise independent judgment as to whether evidence of the alleged offense is likely to be found in the place sought to be searched.

10. The specific averments in the affidavit were:

25. That Lawrence Chesher was identified as a member of the HELLS ANGELS MOTORCYCLE CLUB in a report dated April, 1973, written by the Organized Crime and Criminal Intelligence Branch of the California State Department of Justice.

26. That on June 12, 1979, the Federal Grand Jury for the Northern District of California, at San Francisco, returned a sealed indictment, which charges that Lawrence Chesher was associated with an enterprise within the meaning of 18 U.S.C. 1961(4), to wit, the HELLS ANGELS MOTORCYCLE CLUB, from on or about January 1, 1966 to the date of the indictment.

11. Examination of the indictment reveals that, in fact, the last alleged predicate act by Chesher occurred in September, 1975. The other three alleged acts all occurred in the spring and summer of 1974.

member of Hells Angels in 1979 was deliberately or recklessly false. 438 U.S. at 172, 98 S.Ct. at 2684. We reverse the conviction and remand to the district court with the instruction that such an evidentiary hearing be held. We express no opinion on whether Chesher will prevail at the hearing. If Chesher does not prevail at the hearing, he may then raise again the challenges to the indicia warrant that we need not reach at this time.[12] If, on the other hand, Chesher prevails at the hearing, the district court may grant a new trial. *United States v. Harmon*, 632 F.2d 812 (9th Cir. 1980).

The conviction is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.

ROBERT J. McNICHOLS, District Judge, dissenting:

Because I disagree with the majority's standard of review and its treatment of the issue of sufficiency of the evidence, I respectfully dissent.

In considering Chesher's claim that the evidence against him was insufficient to support the conviction, the majority limits review to a determination of whether the stipulated facts present substantial evidence of guilt beyond a reasonable doubt. In doing so, the majority relies upon *Lundgren v. Freeman*, 307 F.2d 104, 113–115 (9th Cir. 1962) which in turn is based upon rule 52(a) of the Federal Rules of Civil Procedure.

I do not believe that either rule 52(a) Federal Rules of Civil Procedure or *Lundgren* apply to this case. Rule 23(c) of the Federal Rules of Criminal Procedure provides:

(c) Trial Without a Jury. In a case tried without a jury the court shall make a general finding and shall in addition, on request made before the general finding, find the facts specially. Such finding may be oral. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein.

Professor Wright in Federal Practice and Procedure, § 374 states:

In cases in which a jury has been waived, the trial judge must weigh the evidence, determine the credibility of the witnesses, and find the facts. Unlike the corresponding civil rule, Criminal Rule 23(c) does not state the effect which must be given findings in a jury-waived case. On the ultimate finding of guilt, there is a division of authority. Some courts say that it must stand if it is supported by substantial evidence, others that it can be reversed only if "clearly erroneous," and others that it must be reversed if a reasonable mind could not find guilt beyond a reasonable doubt. On findings by the court on *matters other than guilt*, there is general agreement that the "clearly erroneous" test should be applied. This test is given the same meaning in this context as it has in civil cases. [Emphasis added]

I have not found a case in this Circuit establishing a standard of review in a criminal case such as this in which (1) there are no findings of fact or conclusions of law, (2) there is no written opinion by the trial court, and (3) the only evidence is a written stipulation of fact. In such a case the rational approach is for this court to determine de novo whether the evidence establishes guilt beyond any reasonable doubt. There is no reason to defer to the trial judge's determination of guilt.

The Seventh Circuit in *United States v. Tallman*, 437 F.2d 1103, 1104–05 (7th Cir. 1971), applied the "clearly erroneous" test to the *findings* of the trial court but impliedly adopted the rationale of Professor Wright that the "clearly erroneous" test

---

**12.** In addition to his contentions which we have discussed, Chesher also claims that the indicia warrant violates the First Amendment by abridging his freedom of association, and that it violates the Fourth Amendment on grounds other than those we have considered, specifically, that it constitutes a general warrant.

does not apply to the determination of ultimate guilt. In this case, the question whether the stipulated facts prove guilt beyond a reasonable doubt should be determined by this court.

In reaching this conclusion, I am not engaging in an academic exercise. I am not convinced that the stipulated facts prove Chesher's guilt of *manufacturing* the controlled substance beyond a reasonable doubt. The majority concedes that without the bedroom evidence there is insufficient proof. I do not think there is sufficient evidence even if the substance found in the bedroom is considered.

The most significant weakness in the government's case, in my judgment, is the lack of evidence to demonstrate with the requisite degree of certainty that the equipment was ever used for the manufacture of a controlled substance during the time that the defendant was occupying the premises. This factor, together with the dates on certain of the newspapers in which the equipment was wrapped, could very well indicate that it had last been used prior to the defendant Chesher's occupancy of the premises.

There is adequate evidence to support a healthy suspicion, but not enough to eliminate in my mind, a reasonable doubt. The small quantity of the controlled substance in Mr. Chesher's room (the bedroom evidence) does not bridge the gap between strong suspicion and reasonable doubt.

I would reverse Chesher's conviction.