Clyde STEVENSON, Plaintiff-Appellee,

v.

Sue KOSKEY, Defendant-Appellant.

No. 86-4255.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 4, 1988.

Decided June 26, 1989.

---

I. Franklin Hunsaker, Thomas D. Adams, Douglas R. Andres, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for defendant-appellant.

Spencer M. Neal, Ginsburg, Gomez and Neal, Portland, Or., for plaintiff-appellee.

Before WALLACE and REINHARDT, Circuit Judges, and PRICE, District Judge.*

PRICE, District Judge:

The relevant facts are as follows:

Defendant worked as an adult probation parole officer for Washington County Department of Community Corrections ("Department") and had been employed in that capacity for six years. Defendant was assigned to supervise plaintiff, who had been paroled from the Oregon State Prison but who was incarcerated in the Washington County Jail awaiting trial on new charges.

While plaintiff was in the Washington County Jail, defendant went there to deliver an envelope to plaintiff containing a divorce decree and a letter that had been directed to defendant on plaintiff's behalf. Defendant knew that the envelope addressed to plaintiff was from "Inmate Legal Service, Inc." but was unaware whether "Inmate Legal Services, Inc." was an attorney-operated or an inmate-operated organization.

Defendant sought permission to deliver the envelope, divorce decree and a letter to plaintiff but was asked by a Washington

---

* Honorable Edward Dean Price, United States District Judge for the Eastern District of California, sitting by designation.

County corrections officer to first surrender those items for a contraband inspection. Defendant complied with that request and the corrections officer leafed through the documents in the envelope. Plaintiff was not present when that inspection took place.

At the time the inspection occurred, the "Inmate Manual" of the Washington County Jail set forth the Department's policy regarding the examination and inspection of prisoner mail for contraband. The Manual provided in pertinent part:

Official correspondence shall be opened for inspection only in the inmate's presence and mail shall be inspected only for the purpose of insuring that contraband is not present. At no time shall a staff member read any confidential communication.

The envelope, divorce decree and letter were "official correspondence" within the meaning of that provision. Also, when the inspection occurred, the Department's manual on clerical procedures provided, "Be careful not to open mail that is from an attorney and addressed to someone incarcerated in the jail."

Defendant's job responsibilities did not require that she open mail addressed to inmates or that she be familiar with the Department's clerical procedures. Also, although defendant had "thumbed through" the Inmate Manual in the past, she did not recall reading anything regarding the circumstances under which a prisoner's mail may be inspected for contraband.

Prior to the inspection by the corrections officer, defendant had not received training on the constitutional propriety of examining a prisoners official mail. Such training was not included in the course work taken by defendant through the Oregon Board of Police Standards and Training at the National Institute of Training, through defendant's on-the-job training, or through any other source. Furthermore, defendant was unaware of any legal or internal administrative rule that restricted the examination of a prisoner's official mail outside a prisoner's physical presence.

Defendant's counsel perhaps over-generously stipulated that defendant was employed by the Washington County Department of Community Corrections as an adult parole and probation officer.[1] Suffice it to say, defendant Koskey was acting under state law and, hence, would be subject to the liabilities imposed upon such employees by section 1983.

Defendant Koskey interacted at the courthouse with an individual identified only as a "corrections officer". The Oregon statue defines such person as "an officer or member of a law enforcement unit who is employed full time and is charged with and primarily performs the duty of custody, control or supervision of individuals convicted of or arrested for a criminal offense and confined in a place of incarceration or detention other than a place used exclusively for the incarceration or detention of juveniles." *See* Oregon Revised Statutes section 181.610.[2]

The different duties of the actors in this drama come into sharp conflict. The duties of the corrections officer placed him in control of those who proposed to have contact with the prisoners he was mandated to control and supervise, as well as to monitor the contents of printed or written communications that the prisoner might receive. Being placed in this position, it was incumbent upon the corrections officer to be familiar with the rules of the jail governing these activities. Nothing contained in the statutory mandated duties of a probation officer requires probation officers *to be*

1. Probation and Adult Parole Officers are appointed by the judge or judges of the applicable court of criminal jurisdiction. *See* Oregon Revised Statutes section 137.590. The statute further provides that the duties of a probation officer are to make investigations and reports to any court having jurisdiction in the county, city or district in which the officer was appointed to serve, and to supervise persons placed on probation, diversion, work release or community service.

2. It should be noted that section 237.003 of the Oregon Revised Statutes defines correction officers as police officers for purposes of retirement, pension, etc.

intimately acquainted with such rules.[3]

Further, the duties of the corrections officer placed him in a position superior to defendant when they met at the Washington County Jail. In order to accomplish her purpose, defendant had no choice but to accede to the "orders", if you will, of the corrections officer in order to realize her purposes. Under this analysis, defendant had no alternative but to deliver the mail to the corrections officer if she desired to have the mail delivered to plaintiff.[4] In giving the order, the corrections officer was clearly acting appropriately in intercepting the mail. The rule in question provides that certain mail must be opened by the custodial officials in the presence of the addressee-prisoner. The inescapable conclusion of this rule is that all mail may be intercepted and read.[5]

■ Clearly, under this analysis, both the corrections officer and defendant acted correctly in the matter. Once the mail was out of defendant's hands, she, of course, was powerless to influence the further conduct of the corrections officer. This conclusion is mandated by the differing statutory duties of the defendant and the corrections officer. The corrections officer's further handling of the mail was beyond defendant's power to control or to even influence.

Based on the foregoing analysis, we find that defendant was completely out of the chain of causation for the alleged constitutional deprivation. It matters not whether plaintiff's constitutional rights were violated by the corrections officer. Defendant did not participate in such violation.

The dissenting opinion bases its conclusions upon the traditional doctrine of proximate cause. A more exacting examination of that doctrine, we feel, compels a different conclusion.

Federal courts turn to the causation factors developed in the common law of torts to supply the necessary causation factor in the civil rights field. This court enunciated the requisite causal nexus required for section 1983 cases in *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir.1978):

Section 1983 provides, in pertinent part, that "[e]very person who, under color of any statute of any state ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." (42 U.S.C. § 1983). A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made. (*Sims v. Adams,* (5th Cir.1976) 537 F.2d 829). Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional

---

**3.** Section 137.620 of the Oregon Revised Statutes defines the duties of a probation officer in Oregon. Summarized, they are: (a) to make investigations and reports, as directed by the judges of the county; (b) to receive and supervise persons placed on probation by the judges; (c) to provide release assistance, and to supervise any person placed in a diversion, work release or community service program; (d) to give each person placed under their supervision a statement of conditions of their probation or program; instruct such person regarding the conditions; to keep informed concerning the conduct

and conditions of persons placed in their supervision and to encourage such persons to improve their conduct or conditions.

**4.** No one has seriously suggested that defendant return the mail to the sender.

**5.** See *Wolff v. McDonnell,* 418 U.S. 539, 574, 94 S.Ct. 2963, 2983, 41 L.Ed.2d 935, 961 (1974); *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), concerning the right to censor mail of prisoners.

injury. (*Cf. Beverly v. Morris* (5th Cir. 1972) 470 F.2d 1356.)

█ It is important to note that *Johnson v. Duffy, supra,* requires one of three things before liability may be imposed upon a defendant:

1. The defendant must do an affirmative act which results in the plaintiff being deprived of his federally protected rights;

2. The defendant must participate in the affirmative acts of another which, acting concurrently, results in the plaintiff being deprived of his federally protected rights; or

3. The defendant must omit to perform an act which he is legally required to do which causes the deprivation of the plaintiff's federally protected rights.[6]

The authors of Prossor and Keeton on Torts, discuss unforeseeable results of unforeseeable causes in the tort context. They observe, "If the defendant can foresee neither any danger of direct injury, nor any risk from an intervening cause, the defendant is simply not negligent." Prossor & Keeton, Prossor and Keeton on Torts, at 311, section 44, (5th Ed.1984). This analogy is particularly apt here. In tort law, the function of the doctrine of proximate cause is to establish the outer limits to which the negligent actors would result in liability to those injured. As we can see from the above quotation from *Johnson v. Duffy, supra,* proximate cause has served the same purpose in civil rights law.

█ The dissenting opinion makes much of the fact that counsel at argument stipulated that Koskey's act was intentional. The word "intentional" has many varied meanings that take on different shadings depending upon the context in which the word is used.

Webster's New Collegiate Dictionary defines the word "intentional" as "an act done by intention or design." Black's Law Dictionary, Fifth Edition provides:

Intent. Design, resolve, or determination with which person acts. *Witters v.*

*United States,* 70 U.S.App.D.C. 316, 106 F.2d 837, 840. Being a state of mind, is rarely susceptible of direct proof, but must ordinarily be inferred from the facts. It presupposes knowledge. *Reinhard v. Lawrence Warehouse Co.,* 41 Cal.App.2d 741, 107 P.2d 501, 504. A mental attitude which can seldom be proved by direct evidence, but must ordinarily be proved by circumstances from which it may be inferred. *State v. Gantt,* 26 N.C.App. 554, 217 S.E.2d 3, 5. A state of mind existing at the time a person commits an offense and may be shown by act, circumstances and inferences deducible therefrom. *State v. Evans,* 219 Kan. 515, 548 P.2d 772, 777.

The word "intent" is used throughout the Restatement of Torts, 2nd, to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it. Sec. 8A.

As shown by the above quotation, an intentional act becomes important only when the actor intends not only the act, but the harmful consequences of the act. The record contains absolutely no information that defendant either knew of the corrections officer's intention concerning the mail, or alternately, that defendant intended that the officer would disobey the law.

In a series of cases starting with *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Supreme Court developed an analysis of the "state of mind required to constitute a deprivation of property," an issue voiced by Justice Powell in his concurring opinion. *Parratt v. Taylor, supra,* at 547, 101 S.Ct. 1908 at 1919, 68 L.Ed.2d 240. Indeed, Justice Powell argued in that concurring opinion against opening up the federal courts for suits where there was no evidence of an affirmative abuse of governmental power.

This analysis continued in *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In that case, a prison guard left a pillow on the stairway. There

---

**6.** Official ratification of a subordinate's misconduct was suggested to be sufficient to impose liability upon the County in *Hammond v. County of Madera,* 859 F.2d 797, 804 (9th Cir.1988).

was no evidence that he intended the consequences, i.e., injuries to the back and ankle of the plaintiff when he fell after encountering it. The majority opinion observed:

When dealing with a claim that such a document creates a right in prisoners to sue a government official because he negligently created an unsafe condition in the prison, we bear in mind Chief Justice Marshall's admonition that "we must never forget; that it is a *constitution* we are expounding," *McCulloch v. Maryland,* 4 Wheat 316, 407 [4 L.Ed. 579] (1819) (emphasis in original). Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States," *Paul v. Davis,* 424 U.S. 693, 701, 47 L.Ed.2d 405, 96 S.Ct. 1155 [1160] (1976), quoted in *Parratt v. Taylor,* 451 U.S. [527], at 544, 68 L.Ed. 420, 101 S.Ct. 1908 [at 1917].

The only tie between the facts of this case and anything governmental in nature is the fact that respondent was a sheriff's deputy at the Richmond city jail and petitioner was an inmate confined in that jail. But while the Due Process Clause of the Fourteenth Amendment obviously speaks to some facets of this relationship, see, e.g., *Wolff v. McDonnell,* 418 U.S. 539, 41 L.Ed.2d 935, 94 S.Ct. 2963 (1974), we do not believe its protections are triggered by lack of due care by prison officials.

*Id.* at 332–33, 106 S.Ct. at 666, 88 L.Ed.2d at 669.

The Court continued its analysis in *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). In that case the plaintiff sent a note to prison officials that he had been threatened by an inmate. The officers who received it discredited its importance and passed it on to another officer who forgot about it. The plaintiff was assaulted by the inmate, and suffered personal injury. State law granted complete immunization of public employees from claims of this type. The majority opinion pointed out as follows:

Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent. *Daniels,* ante, [474 U.S.] at 331–333, 88 L.Ed.2d 662, 106 S.Ct. 662 [at 665–666]. Far from abusing governmental power, or employing it as an instrument of oppression, respondent Cannon mistakenly believed that the situation was not particularly serious, and respondent James simply forgot about the note. The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.

*Id.* at 347–48, 106 S.Ct. at 670, 88 L.Ed.2d at 677.

This analysis was further advanced in *City of Canton, Ohio v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Supreme Court abandoned "gross negligence" as the test for a city's liability from failure to train its employees and replaced it with a "deliberate indifference" test. Thus the requirement that only a municipal *policy* can give rise to section 1983 liability means that such liability arises only from a "'deliberate' or 'conscious' choice." *Id.* 109 S.Ct. at 1205. Requiring such a deliberate or conscious choice by municipalities presents interesting parallels with *Daniels*'s and *Davidson*'s emphasis on deliberate or intentional conduct by individuals.

The Supreme Court has held that an official's negligent act does not implicate the due process clause. *Daniels,* 474 U.S. at 332, 106 S.Ct. at 665; *Davidson,* 474 U.S. at 347, 106 S.Ct. at 670; *Rinker v. County of Napa,* 831 F.2d 829, 832 (9th Cir.1987). In the context of constitutional torts, it is the deliberate, intentional abuse of governmental power for the purpose of depriving a person of life, liberty or property that the fourteenth amendment was designed to

prevent. *See Daniels,* 474 U.S. at 330–32, 106 S.Ct. at 664–65; *Davidson,* 474 U.S. at 347–48, 106 S.Ct. at 670. Allowing mere negligence to sustain a due process claim under section 1983 would trivialize the fourteenth amendment. *Daniels,* 474 U.S. at 332, 335, 106 S.Ct. at 665, 667. Actions such as mislaying an inmate's property, or leaving a pillow on the prison stairs, suggest not abuse of power but merely "failure to measure up to the conduct of a reasonable person." *Id.* at 332, 106 S.Ct. at 665.

Applying the foregoing tests, we do not believe that Koskey's culpability rose to the level of the intent constitutionally required for section 1983 liability under *Daniels.* We draw this conclusion from our examination of the entire factual record in this case, that is, the stipulated facts agreed to by the parties. Relying solely on these stipulated facts, the district court found that Koskey "reasonably could have foreseen" that the guard would open Stevenson's legal mail outside his presence. This conclusion is reviewed for clear error. *See EEOC v. Maricopa County Community College District,* 736 F.2d 510, 513 (9th Cir.1984) (finding of fact derived from stipulated facts reviewed for clear error); *United States v. Chesher,* 678 F.2d 1353, 1358 n. 3 (9th Cir.1982) (same); *Weyerhaeuser Co. v. Altropos Island,* 777 F.2d 1344, 1349–50 (9th Cir.1985) (district court's findings of negligence and proximate cause reviewed for clear error). We believe the district court clearly erred.

The stipulated facts reveal only that Koskey complied with the guard's request that she surrender Stevenson's mail, which qualified as legal mail, for inspection. The guard then thumbed through the documents in the envelope. [*Id.*] The record here contains *no other factual information* about Koskey's encounter with the guard. We see no basis for the conclusion that Koskey reasonably could have foreseen that the guard would open the envelope. The guard might just as likely have inspected the envelope by feeling it without opening it. Nothing in this record indicates that Koskey could have known otherwise. The burden of establishing

Koskey's level of culpability rests with the plaintiff, Stevenson. *See, e.g., Rinker, supra,* 831 F.2d at 831–32. Stevenson has not shown, based on this record, that Koskey's conduct concerning plaintiff's mail rose beyond the level of mere negligence. Although Koskey may perhaps be said to have handed the letter over intentionally, the relevant event for purposes of analyzing Koskey's culpability is the alleged constitutional injury, the guard's opening of the letter outside Stevenson's presence. *See, e.g., Rinker, supra,* 831 F.2d at 832; *see also,* Dissent [Reinhardt op.] at 1442. As to the actual opening of the letter, we do not see how Koskey was more than negligent. We are not sure whether she was even negligent. And interestingly, it is not even clear from this record that the envelope had not already been opened before Koskey arrived at the prison.

A different case, or a different record in this case might provide better support for the dissent's conclusion that conduct such as Koskey's rises above negligence. But such a case is not before us.

The case is reversed and remanded to the trial court to enter a judgment in conformity with this opinion.

WALLACE, Circuit Judge, concurring:

I concur in the result and I concur in the opinion of Judge Price to the extent that it rests on the conclusion that Koskey's conduct was no more than negligent and thus did not rise to the level of culpability required in section 1983 due process actions under *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). *See also Rinker v. County of Napa,* 831 F.2d 829 (9th Cir.1987). Although the majority opinion presents a strong argument on the difficult questions of proximate and intervening cause, I see no reason to reach the issues. The conclusion, shared by Judge Price and myself, that Koskey's state of mind does not rise to the level necessary to support liability provides a sufficient basis for reversing the decision of the district court.

REINHARDT, Circuit Judge, dissenting:

The majority reaches a simple conclusion. It holds—amidst considerable dictum—that under the facts of this case, appellee (Stevenson) has been unable to prove more than simple negligence on the part of appellant (Koskey). While I do not quarrel with the legal conclusion that negligence does not rise to the level of a constitutional violation, I strongly disagree with the majority's characterization of events and its willingness to overturn the factual conclusions of the district court which the parties themselves accept as correct.

Stevenson was a prisoner in the Washington County Jail. Koskey was his assigned probation and parole officer. For reasons not entirely clear from the record, legal mail addressed to Stevenson fell into the hands of Koskey. Rather than sending the legal correspondence through normal channels, Koskey voluntarily assumed responsibility for hand-delivering the letter directly to Stevenson. When she arrived at the jail, a prison guard, whose identity remains unknown, requested that she surrender the letter for inspection. She handed the letter to the guard and waited while he opened and leafed through the contents. Stevenson was not present during the inspection. As the district court found, and as Koskey's counsel conceded at oral argument, Koskey "intentionally gave legal mail to a correction's officer for inspection outside of the inmate's presence." Her actions constituted constitutional error.

The case was tried on stipulated facts. Admittedly, the stipulated facts are subject to conflicting interpretations. The facts simply say that appellant "was asked by a Washington County corrections officer to first surrender those items for a contraband inspection. Defendant complied with that request and the corrections officer leafed through the documents in the envelope." The stipulated facts do not clearly say whether Koskey handed over the letter and then was surprised by the guard's unconstitutional search or whether she handed the letter over for the understood purpose of permitting its search outside the presence of the prisoner. Both constructions are consistent with the parties' stipulations.

I see two compelling reasons why we are required to adopt the second version of events. First, Judge Panner, the finder of fact, found that Koskey intentionally turned over the letter to the prison guard for the purpose of an immediate search. It is absolutely clear in this circuit that this finding is reversible only if it is clearly erroneous. *See, e.g., EEOC v. Maricopa County Community College District,* 736 F.2d 510, 513 (9th Cir.1984); *Nicholson v. Board of Education,* 682 F.2d 858, 864 n. 6 (9th Cir.1982); *United States v. Chesher,* 678 F.2d 1353, 1358 n. 3 (9th Cir.1982); *Collins v. Thompson,* 679 F.2d 168, 170 (9th Cir.1982); *United States v. Mountain States Construction Co.,* 588 F.2d 259, 264 n. 5 (9th Cir.1878); *Starsky v. Williams,* 512 F.2d 109, 111 (9th Cir.1975); *Lundgren v. Freeman,* 307 F.2d 104, 115 (9th Cir. 1962). Our review of the trial court's factual determinations is thus highly deferential, and any situation that may give rise to two plausible interpretations must be resolved in a manner consistent with the district court's findings. In this case, Judge Panner concluded from the stipulated record that Koskey intended that the guard open the letter. His findings are consistent with the stipulated facts and well supported in the underlying trial documentation.[1] There is no basis, whatsoever, in fact or in law, for the majority's peremptory conclusion that the district court's findings are clearly erroneous.

Second, appellant *never,* not in her trial memorandum or in her appellate brief, contests the factual finding of the district court. Nowhere does she suggest that she was surprised or taken aback by the guard's actions. I find it remarkable that the majority has based its entire argument on a perceived need to overturn, as clearly erroneous, a factual finding that the parties do not even dispute. In effect, the

---

**1.** The record before the district court also included affidavits and memoranda which support Judge Panner's interpretation of the evidence.

majority has broken two basic laws of appellate review: deference to factual findings of the district court and review limited to the issues raised by the parties.

The majority's version of events gives the entire opinion a mechanical and ineluctable feel, one unrelated to the realities of the dispute. Under Judge Price's factual theory of the case, Koskey had no choice but to hand over the legal letter to the prison guard.[2] She—like more famous government officials—was merely following orders. "In order to accomplish her purpose, defendant had no choice but to accede to the 'orders,' if you will, of the corrections officer in order to realize her purposes." Maj. op. at 1438. Whatever may be the merits of the Nuremburg-style defense Judge Price has so imaginatively dreamed up for Koskey, a fundamental difficulty with it is that in this case the facts to support such a defense are simply not present. Koskey clearly had options. She was unquestionably in a position to do something about the violation of Stevenson's constitutional rights. All she had to do, for example, was request the guard to obey the law. At the very least, she could have turned around, walked out the door, and stuck the letter in the nearest mailbox. The letter would have gone through normal prison channels and, one is entitled to presume, eventually been opened in the prisoner's presence.[3] I think this relatively slight inconvenience would have been a small price to pay for the protection of Stevenson's constitutional rights.

The interpretation of the facts accepted by the parties to this case and by the district court should fairly lay to rest the central arguments of the majority. On appeal, appellant has never questioned Judge Panner's finding that she handed over the confidential letter for the purpose of permitting the guard to make a search outside the presence of the intended recipient. Rather, she has relied on three legal theories that she contends preclude a finding of liability notwithstanding the intentional nature of her conduct. Because the majority reaches a conclusion based *solely* upon the erroneous factual findings it renders *sua sponte*, I see no reason to address any of appellant's legal arguments, all of which I believe to be without merit. I dissent.

---

2. Judge Price goes so far as to suggest that legal mail may properly be read by the prison guard. Maj. op. at 1438. The prison rules clearly allow only for a contraband inspection, a search that does not permit the *reading* of legal mail. The rules explicitly bar reading such mail. "At no time shall a staff member read any confidential communication." Even if the prison rules did permit Judge Price's interpretation, it should be clear that reading legal mail is a violation of the prisoner's privacy rights and the attorney-client privilege. *See, e.g., Taylor v. Sterrett,* 532 F.2d 462, 475 (5th Cir.1976).

3. The WCCC has now belatedly adopted this practice for delivering mail to inmates.