Lepine, et al. v. NH Dept. of Correct CV-97-072-M    09/30/99

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

William Lepine, et al.,
      Plaintiffs

v.                                          Civil No. 97-72-M

Paul Brodeur, Commissioner,
New Hampshire Department of
Corrections, et al.,
      Defendants

**O R D E R**

Plaintiffs, a group of inmates currently or formerly incarcerated at the New Hampshire State Prison ("NHSP"), seek damages and injunctive relief pursuant to 42 U.S.C. § 1983. They allege that defendants committed numerous "violations of Constitutional rights, State tort laws, Federal Postal regulations, Federal Copyright laws and this Court's prior orders." Plaintiffs' complaint at para. 1. Generally speaking, plaintiffs challenge aspects of the New Hampshire Department of Corrections Policy and Procedure Directive governing inmate mail service (the "PPD") that prohibit inmates from receiving or possessing material depicting "homosexual acts, bestiality, bondage, sadomasochism, or sex involving children." The PPD is unconstitutionally over-broad, plaintiffs say, to the extent it precludes male inmates from receiving publications containing

photographs of nude female models shown posing in various lesbian love scenes. Plaintiffs also challenge the prison's handling of coming and outgoing inmate mail, claiming that it is often lost, misdirected, and opened unlawfully.

By order dated February 5, 1998, the court approved the Magistrate Judge's Report and Recommendation and granted, in part, defendants' motion to dismiss. Specifically, the court dismissed all of plaintiffs' state law tort claims as well as their section 1983 claims for money damages against all defendants in their official capacities. Freeman v. Brodeur, No. 97-72-M, slip op. (D.N.H. February 5, 1998) (document no. 44). Additionally, a number of the original plaintiffs (including Leonard Freeman) have voluntarily withdrawn their claims. The eight remaining plaintiffs in this action are: William Lepine, Steven Roy, John Clancy, Francis Pierce, Jr., Marc Adams, Karl Sagar, Darren Starr, and Charles Drenas, Jr.

Defendants have moved for summary judgment as to all of plaintiffs' remaining claims. Plaintiffs object.

## Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party

2

is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

## Discussion

Before addressing the substance of defendants' motion for summary judgment, it is probably helpful to first identify the nature of plaintiffs' claims. Their complaint arguably sets forth seven counts, each of which relates in some way to the manner in which the prison handles inmate mail. A fair reading of the complaint reveals that the following claims are raised:

1. Count One - Plaintiffs assert that defendants willfully breached a prior order of this court and are, therefore, in contempt. Complaint para. 48.

2. Count Two - Plaintiffs assert that the PPD provisions censoring certain inmate mail (e.g., the prohibition against inmates possessing or receiving any graphic depictions of homosexual conduct) violate their First Amendment rights. Complaint, para. 49.

3. Count Three - Plaintiffs attempt to assert a private right of action for alleged violations of "U.S. Postal Regulations and Federal laws pertaining to the handling of U.S. Mail." Complaint, para. 50.

3

4. Count Four - Plaintiffs assert that, by "damaging, losing, stealing and seizing plaintiffs' property without returning it," defendants violated their property rights and various New Hampshire criminal statutes. Complaint, para. 51.

5. Count Five - Plaintiffs assert that defendants violated federal copyright laws and their First Amendment freedom of expression by "seizing Plaintiffs' copyrightable creative works without returning them." Complaint, para. 52.

6. Count Six - Plaintiffs say that defendants violated various federal postal statutes and regulations, as well as plaintiffs' constitutional right of reasonable access to the courts, by "losing mail addressed to attorneys, Courts, and civil rights organizations." Complaint, para. 53.

7. Count Seven - Plaintiffs claim that defendants violated their "property rights" by "implementing a harsher publications standard after requiring inmates to order their magazines through subscriptions." Complaint, para. 54.

I. Preliminary Matters.

A. Count One.

The court will treat Count One as a motion to hold defendants in contempt for having knowingly violated a prior order of this court. That motion is denied.

B. Count Two.

4

In Count Two of their complaint, plaintiffs allege that various provisions of the challenged PPD violate their First Amendment rights. Those claims are addressed in detail below.

C. Count Three.

Count Three asserts a claim based upon alleged violations of federal postal laws and regulations, but no private right of action exists. See, e.g., Contemporary Mission, Inc. v. United States Postal Service, 648 F.2d 97, 103 n.7 (2d Cir. 1981); Bugguley v. Barr, 893 F.Supp. 967, 971 (D.Kan. 1995). As to that claim, therefore, defendants are entitled to judgment as a matter of law.

D. Count Four.

To the extent Count Four asserts a private cause of action for alleged violations of unidentified provisions of New Hampshire's criminal code, that state law claim was dismissed by prior order. To the extent it asserts a section 1983 claim for alleged deprivations of property without due process, the court will address it below.

E. Count Five.

5

As to Count Five (alleged violations of federal copyright laws), plaintiffs have not advanced any arguments (nor have they produced any evidence) in support of that claim. Given that the claim appears meritless on its face and has not been developed, the court deems that claim, to the extent a cognizable cause of action might exist, to have been waived.

F.    Count Six.

As to Count Six, there is, as noted above, no private cause of action for alleged violations of federal postal laws and regulations and defendants are entitled to summary judgment. To the extent that plaintiffs assert that defendants violated their constitutional rights and deprived them of meaningful access to the courts by opening and/or discarding privileged "legal mail," defendants are likewise entitled to judgment as a matter of law.[1]

---

[1]    Parenthetically, the court notes that plaintiffs' memorandum in opposition to summary judgment (document no. 81) suggests that certain unidentified "Defendants, in stormtrooper manner, rifled Plaintiffs Roy and Adams legal work and seized numerous pieces of evidence" and, in so doing, violated the First and Fourteenth Amendments. See id., "Argument 6." Importantly, however, plaintiffs' complaint raises no such claim. Instead, it merely asserts that defendants' policy and practice concerning the handling and delivery of prisoners' legal mail somehow violated plaintiffs' constitutional rights. Accordingly, the court need not address plaintiffs' apparent claim (raised only in their legal memorandum) that some of them were subjected to unlawful or unconstitutional cell shake-downs or confiscation of arguably privileged materials already in their possession.

With regard to their claim that defendants have deprived them of meaningful access to the courts, plaintiffs have provided little, if any, support for their conclusory assertion that defendants unlawfully opened, destroyed, misdirected, or tampered with their legal mail.  To be sure, it is settled that prison officials may only open an inmate's legal mail in his or her presence.  See Wolff v. McDonnell, 418 U.S. 539, 576-77 (1974).  It is, however, equally well established that prison regulations may lawfully require all privileged inmate mail to be specifically marked as, for example, originating from an attorney.  Id. ("We think it entirely appropriate that the State require any such communications to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment.  It would also certainly be permissible that prison authorities require that a lawyer desiring to correspond with a prisoner, first identify himself and his client to the prison officials, to assure that the letters marked privileged are actually from members of the bar.") (emphasis in original).  See also United States v. Stotts, 925 F.2d 83 (4th Cir. 1991) (discussing federal prison regulations concerning prisoner mail, which distinguish between "general mail" and "special mail," the latter of which must be clearly labeled and, if originating from an attorney's office,

7

must bear his or her name as well as some indication that he or she is an attorney).

In this case, the challenged prison regulations specifically provide that all arguably privileged mail directed to an inmate must bear the word "privileged" on the outside of the envelope and must originate from a designated agency or individual (including the inmate's legal counsel). See PPD 5.26 IV(F). Plaintiffs have not, however, submitted any envelopes which conform to the foregoing regulations and which they claim were unlawfully opened. Nor have they submitted affidavits or deposition testimony from anyone who claims to have mailed privileged material to an inmate that was either not delivered or returned to sender. To survive a motion for summary judgment, plaintiffs must do more than merely repeat the unsupported allegations set forth in their complaint. Here, they have failed to do so.

More importantly, however, plaintiffs have failed to allege (much less provide any evidence to support) any claim that defendants' conduct actually "hindered [their] efforts to pursue a legal claim." Lewis v. Casey, 518 U.S. 343, 351 (1996). Stated somewhat differently, the record is devoid of any

8

reference to an essential element of all claims asserting a deprivation of meaningful access to the courts: actual injury. See id. ("He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered some arguably actionable harm that he wished to bring before the courts, but was so stymied, . . . that he was unable even to file a complaint."). In fact, the record suggests that plaintiffs have suffered no such injury. Rather, they have succeeded in presenting their constitutional claims to this court and have filed a substantial number of pleadings in this matter, not the least of which are their memoranda in opposition to defendants' motion for summary judgment.

For the foregoing reasons, defendants are entitled to summary judgment on Count Six of plaintiffs' complaint.

G.   Count Seven.

It is difficult to discern exactly what plaintiffs are claiming in Count Seven. To the extent they assert that the prison's mail regulations violate their First Amendment rights, that claim is subsumed within Count Two (which is discussed

9

below).  To the extent they say that they have been deprived of property without due process and just compensation, that claim is subsumed within Count Four (which is also discussed below).  Count Seven is, therefore, dismissed (and, even if the court were to consider it on the merits, defendants would, for the reasons set forth below, be entitled to judgment as a matter of law).

Having distilled plaintiffs' claims and reorganized their complaint into an understandable form, it appears that the substance of their viable claims is set forth in Counts Two and Four.  Count Two alleges that plaintiffs' First Amendment rights have been unconstitutionally infringed by: (1) the NHSP regulations governing the possession of sexually explicit materials (particularly the provision proscribing possession of graphic depictions of homosexual sexual conduct); and (2) the NHSP regulations concerning bulk mail.  Count Four alleges that, by mishandling or misdirecting various items of prisoner mail (including the proscribed sexually explicit materials at issue in Count Two), defendants deprived plaintiffs of property without due process and just compensation.

II.  Count Two - The PPD Governing Prisoner Mail.

10

Plaintiffs assert that defendants' enforcement of various prison regulations governing the delivery of mail to prisoners violates their First Amendment rights. Specifically, plaintiffs claim:

> The Defendants, in applying unlawful, unreasonable, oppressive, and inconsistent censorship standards have violated the Plaintiffs' First Amendment rights that guarantee the freedom to read and view whatever they choose.

Complaint, para. 49.

Before addressing the merits of plaintiffs' specific challenges to the prison's mail regulations, it is appropriate to focus on a few basic, well-established constitutional principles. Perhaps the most important, at least from plaintiffs' perspective, is that inmates do not lose their First Amendment rights (including the right to receive mail) solely because they are incarcerated. See, e.g., Turner v. Safley, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). It is, however, clearly established that inmates' First Amendment rights necessarily yield when they can reasonably be viewed as conflicting with legitimate penological goals. So, while inmates retain their right to receive mail, that right is subject to

11

reasonable prison regulation that is rationally related to the advancement of legitimate penological goals.  See Turner v. Safley, supra; Thornburgh v. Abbott, 490 U.S. 401 (1989).

A.    The PPD Provisions Banning Possession of Materials
      Depicting Homosexual Acts.

The challenged portion of the PPD provides, in pertinent part, that prisoners may neither receive nor possess:

    Obscene material, including publications containing
    explicit descriptions, advertisements, or pictorial
    representations of homosexual acts, bestiality,
    bondage, sadomasochism, or sex involving children.

Department of Corrections Policy and Procedure Directive 5.26 IV(C)(3)(a).  Plaintiffs appear to acknowledge the legitimate and rational justifications underlying a policy that precludes male inmates from possessing explicit depictions of men engaged in homosexual acts.  Nevertheless, they argue that there is no legitimate penological interest advanced by prohibiting male inmates from possessing sexually explicit materials depicting women engaged in homosexual acts.

In considering the constitutionality of the challenged PPD, the court employs a deferential standard of review.

12

> [W]hen a prison regulation impinges on inmates'
> constitutional rights, the regulation is valid if it is
> reasonably related to legitimate penological interests.
> In our view, such a standard is necessary if prison
> administrators . . ., and not the courts, are to make
> the difficult judgments concerning institutional
> operations.

Turner v. Safley, 482 U.S. at 89 (citation and internal quotation marks omitted). And, to determine whether the regulation barring materials containing depictions of homosexual acts is constitutionally permissible, the court must consider four factors: (1) whether there is a valid, rational connection between the policy and the legitimate governmental interest advanced as justification for it; (2) whether there are alternative means by which prisoners might exercise the right infringed; (3) whether the impact of accommodating the asserted constitutional right will have a substantial negative impact on other inmates, correctional officers, and/or the allocation of prison resources generally; and, finally, (4) whether the policy is an "exaggerated response" to the prison's asserted concerns. See Turner v. Safley, 482 U.S. at 89-91. With regard to the final factor, the Supreme Court has made clear that prison officials are not required to implement the "least restrictive" means available to advance legitimate penological goals. Id., at 90. That is, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating

13

the [inmate's] constitutional complaint."  Id., at 90-91.
Rather, if the inmate can point to an "alternative that fully
accommodates [his or her] rights at de minimus cost to valid
penological interests, a court may consider that as evidence that
the regulation does not satisfy the reasonable relationship
test."  Id., at 91.

Considering the challenged prison policy in light of the
four factors identified by the Supreme Court in Turner and the
arguments advanced by plaintiffs, the court concludes that the
PPD does not unconstitutionally infringe upon plaintiffs' First
Amendment rights.  First, there is a valid and rational
connection between the PPD's provisions and the legitimate
governmental interests asserted to justify it.  The PPD was
implemented in an effort to maintain prison security, facilitate
rehabilitation of inmates, and reduce sexual harassment of female
correctional officers.  The Warden has testified that the policy
was implemented, in part, as a response to legitimate concerns
that allowing inmates to possess sexually explicit material
depicting women engaged in homosexual acts would "significantly
adversely affect [female] correctional officers' working
environment and safety."  Affidavit of Warden Michael Cunningham,
at para. 14.  Plainly, efforts aimed at "protecting the safety of

14

guards . . . is a legitimate interest, and . . . reducing sexual harassment [of female guards] in particular likewise is legitimate." Mauro v. Arpaio, ___ F.3d. ___, 1999 WL 618006 at *3 (9th Cir. August 17, 1999). Additionally, the Warden testified that:

> The head of the sexual offender program was also consulted and has advised that sexually explicit material may be significant in perpetuating a number of dangerous and undesirable traits, including portraying women as sex objects, using sex for control, reinforcing sexual addictions, increasing the likelihood of sexual approaches to staff and its use as a contraband within the prison.

Cunningham affidavit, at para. 14. See also Attachment 3 to Cunningham affidavit (survey of female correctional officers concerning sexual attitudes of inmates, their behavior toward female correctional officers, and the officers' views on the effects of permitting inmates to possess materials depicting sexual activity between women); Attachment 4 (Letter to Warden Cunningham from Sexual Offender Program Coordinator, Clinical Mental Health Counselor, and Chief of Mental Health, all of whom identified numerous potential risks associated with allowing inmates to possess sexually explicit material). See also Amatel v. Reno, 156 F.3d 192 (D.C. Cir. 1998) (generally discussing the body of research which concludes that exposure to pornography may, among other things, make men more aggressive and contribute

15

to negative views towards women and sex, and holding that the "legitimacy of the rehabilitative purpose [of penal facilities] appears indisputable," and finding that Congress could reasonably determine that pornography has a negative impact upon a prison's legitimate efforts to rehabilitate inmates), cert. denied, 119 S.Ct. 2392 (1999).

Defendants need not establish with mathematical certainty that the presence of graphic, sexually oriented materials depicting female homosexual contact will necessarily lead to an increase in inmate aggressiveness or hostility, foster more substantial harassment of female correctional officers, or undermine the prison's legitimate efforts to rehabilitate inmates. There is certainly a sizable volume of scholarly research available to support either side of that debate. However, as the Court of Appeals for the District of Columbia observed, although the scientific evidence on this issue is not conclusive, "for judges seeking only a reasonable connection between legislative goals and actions, scientific indeterminacy is determinative." Amatel, 156 F.3d at 192. In light of the foregoing, the court concludes that there is a rational connection between the limited restrictions imposed by the challenged PPD and legitimate penological interests. See Turner

16

v. Safley, 482 U.S. at 89; Thornburgh v. Abbott, 490 U.S. at 414-19.

Next, the court must determine whether the challenged PPD provides inmates with "alternative means of exercising" the asserted right. In doing so, however, the court must be "particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." Turner v. Safley, 482 U.S. at 90 (citation and internal quotation marks omitted). Again, the challenged PPD passes muster. Inmates are not prohibited from receiving or possessing all sexually oriented materials, nor are they barred from obtaining a variety of publications which depict female nudity. Instead, the regulations only restrict access to those materials depicting forms of homosexual sexual behavior (including depictions of lesbian sexual conduct). See generally Thornburgh v. Abbott, 490 U.S. at 418 ("As the regulations at issue in the present case permit a broad range of publications to be sent, received, and read, this factor [i.e., the "neutrality" requirement] is clearly satisfied."); Turner v. Safley, 482 U.S. at 92 ("[T]he correspondence regulation does not deprive prisoners of all means of expression. Rather, it bars communication only with a limited class of other people with whom

17

prison officials have particular cause to be concerned - inmates at other institutions within the Missouri prison system."); O'Lone v. Estate of Shabazz, 482 U.S. 342, 351-52 (1987) (upholding a restriction on inmates' ability to attend the Muslim religious ceremony Jumu'ah, concluding that inmates were permitted to participate in other Muslim religious ceremonies).

In this case, the restrictions imposed by the challenged PPD are far less expansive than those challenged (and upheld) in other cases, including, for example, Mauro, supra. There, in concluding that a prison regulation banning all "materials that show frontal nudity" was not so broad as to present inmates with no alternative means by which to exercise their asserted constitutional rights, the Ninth Circuit, sitting en banc, said:

> We agree with the district court that a sensible and expansive view of the constitutional right infringed by the jail's policy is the "right to receive sexually explicit communications." Viewed in this sensible and expansive manner, there are many alternative means available to the inmates. As the district court recognized, although the policy bans all sexually explicit materials depicting frontal nudity, it does not ban sexually explicit letters between inmates and others, nor does it ban sexually explicit articles or photographs of clothed females.

Mauro, ___ F.3d ___, 1999 WL 618006, at *5.

18

As noted above, inmates at the NHSP are __not__ precluded from obtaining all materials containing photographs of nude women, nor are they prohibited from possessing a variety of sexually oriented materials (both written and graphic). Instead, the scope of the PPD's restrictions is more limited: inmates may not possess only those materials containing graphic depictions of homosexual conduct (including sexual contact between women). Publications fairly classified as sexual in orientation, such as Playboy, Penthouse, and Outlaw Biker, do not usually fall within the scope of the PPD's ban. Thus, inmates have any number of available avenues by which to exercise their asserted First Amendment rights. See, e.g., Amatel, 156 F.3d at 202 ("we again note that the regulation, by its terms only restricts pictures; a prisoner may __read__ anything he pleases.") (emphasis in original).

The third factor identified in Turner which the court must consider in determining the validity of the challenged PPD is the impact that accommodating plaintiffs' asserted constitutional right would have upon prison personnel, other inmates, and the allocation of prison resources. Defendants have adequately supported their claim that allowing inmates unrestricted access to materials containing graphic depictions of sexual activity between women would likely have a substantial negative impact on

19

prison security, exacerbate sexual harassment of female correctional officers, contribute to the creation of a hostile work environment, and drain already limited prison resources. See Mauro, ___ F.3d ___, 1999 WL 618006, at *5-6; Amatel, 156 F.3d at 196-201.

Finally, the court concludes that the PPD does not constitute an "exaggerated response" to the legitimate penological concerns identified by defendants. See Turner v. Safley, 482 U.S. at 90-91. The burden is on plaintiffs to show that there are obvious, easy alternatives to the regulation. See O'Lone, 482 U.S. at 350; Turner v. Safley, 482, U.S. at 91. Plaintiffs have failed to carry that burden. To the extent that plaintiffs suggest the disputed sexually oriented materials might simply be withheld from inmates identified as sexual offenders, such a proposal is unworkable and insufficient to carry their burden. See, e.g., Amatel, 156 F.3d at 201 ("Even if pornography could be directed only to those not likely to be adversely affected, it could find its way to others, interfering with their rehabilitation and increasing threats to safety.").

For the foregoing reasons, the court concludes that the challenged PPD, prohibiting prisoners from possessing or

receiving graphic depictions of lesbian sexual contact, does not violate plaintiffs' First Amendment rights. As the <u>Mauro</u> court observed:

> We recognize that there may be a different, less restrictive means of achieving defendants' legitimate objectives. Under <u>Thornburgh</u>, however, the defendants are not required to adopt the least restrictive means of achieving these objectives. Rather, the defendants must simply ensure that the policy is reasonably related to legitimate penological interests. Because, under the facts of this case, the prohibition on sexually explicit materials [i.e., those depicting frontal nudity] fulfills this reasonableness test, we hold that the policy does not violate the First Amendment.

<u>Mauro</u>, ___ F.3d ___, 1999 WL 618006, at *8. <u>See generally</u>, <u>Amatel</u>, 156 F.3d 192 (discussing the so-called "Ensign Amendment" and its ban on the use of federal prison funds for the distribution of commercial material that is sexually explicit or features photographs or other graphic depictions of nudity[2]); <u>Giano v. Senkowski</u>, 54 F.3d 1050 (2d Cir. 1995) (upholding prison regulation prohibiting prisoners from possessing nude or semi-

---

[2] The Ensign Amendment was enacted as section 614 of the Omnibus Consolidated Appropriations Act of 1997. Pub. L. No. 104-208, § 614, 110 Stat. 3009 (Sept. 30, 1996). It prohibits the Federal Bureau of Prisons from using federal funds to "distribute or make available . . . to a prisoner" any commercially published information or material that "is sexually explicit or features nudity." The regulations define "nudity" as "a pictorial depiction where genitalia or female breasts are exposed." 28 C.F.R. § 540.72(b)(2).

nude photographs of spouses or girlfriends); <u>Powell v. Riveland</u>, 991 F.Supp. 1249 (W.D.Wash. 1997) (upholding prison regulation prohibiting prisoners from possessing sexually explicit material); <u>Snelling v. Riveland</u>, 983 F.Supp. 930 (E.D.Wash. 1997) (rejecting inmate's claim that prison policy banning receipt of written or graphic sexually explicit material violated his First Amendment rights), <u>aff'd</u> 165 F.3d 917 (9th Cir. 1998).

B.    Qualified Immunity as to Plaintiffs' First Amendment Claims Concerning Sexually Explicit Materials.

The Supreme Court has directed that when a qualified immunity defense is asserted in a constitutional tort case, courts should first determine whether the plaintiffs' constitutional rights were, in fact, violated. Only if the court concludes that a constitutional right was violated, should it turn to the issue of qualified immunity. <u>See</u> <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 841 n.5 (1998); <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991). Having concluded that defendants (and their enforcement of the PPD at issue in this case) did not violate plaintiffs' constitutional rights, the court might reasonably forego any discussion of defendants' entitlement to qualified immunity. Nevertheless, the issues presented by plaintiffs are complex and it is conceivable that reasonable minds might disagree as to their proper resolution.

22

Accordingly, a brief discussion of qualified immunity seems appropriate.

The doctrine of qualified immunity provides that, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). This doctrine recognizes that "officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages." Davis v. Scherer, 468 U.S. 183, 195 (1984). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987). As the Court of Appeals for the First Circuit has cautioned, however:

> [I]n assessing a claim of qualified immunity, it is not sufficient for a court to ascertain in a general sense that the alleged right existed, otherwise "plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability

23

simply by alleging violation of extremely abstract rights."

Borucki v. Ryan, 827 F.2d 836, (1st Cir. 1987) (quoting Anderson, 483 U.S. at 639). "To be 'clearly established,' the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 228 (1st Cir. 1992) (quoting Anderson, 483 U.S. at 640)).

> This does not mean that a right is clearly established only if there is precedent of considerable factual similarity. It does mean, however, that the law must have defined the right in a quite specific manner, and that the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent ex ante to reasonable public officials.

Brady v. Dill, ___ F.3d ___, 1999 WL 508812 at *10 (1st Cir. July 22, 1999) (citations omitted). Finally, the court notes that, "The determination whether or not a party is entitled to qualified immunity is a legal decision and it is reserved for the court." Whiting v. Kirk, 960 F.2d 248, 250 (1st Cir. 1992).

As indicated above, there is a substantial body of law upholding prison regulations that restrict inmates' access to sexually oriented materials (both written and graphic). Many of those decisions uphold the validity of regulations far broader in

24

scope than those at issue here.  See, e.g., Mauro, ___ F.3d ___, 1999 WL 618006 (rejecting inmates' constitutional challenge to regulation banning all "materials that show frontal nudity," including personal photographs, drawings, and magazines); Amatel v. Reno, 156 F.3d 192 (D.C. Cir. 1998) (rejecting prisoners' constitutional challenge to the Ensign Amendment and the provisions of 28 C.F.R. § 540.72, which prohibit the use of federal funds to distribute any material which "features nudity").

Given those decisions, even assuming a constitutional violation, one could not reasonably conclude that defendants knew, or even should have known, that enforcing the PPD and denying plaintiffs access to a very limited category of graphic, sexually oriented materials (i.e., those depicting women engaged in sexual activity) would likely violate plaintiffs' clearly established constitutional rights.  Viewed from a slightly different perspective, the court cannot conclude that, at any time relevant to this proceeding, plaintiffs' alleged constitutional right to receive graphic depictions of sexually explicit materials (particularly those involving sexual contact between women) was "clearly established."  So, even if plaintiffs demonstrated that defendants violated their First Amendment

25

rights by enforcing the challenged provisions of the PPD (which they have not), defendants would still be entitled to qualified immunity.

C. Count Two - The PPD Provisions Concerning Bulk Mail.

The challenged aspects of the PPD, as they relate to so-called "bulk mail" and mail order catalogs, provide that:

> Bulk mail, that advertises or solicits any item or service that inmates are not authorized to receive, will not be forwarded to the inmate but will be removed from the institution an[d] destroyed. Mail order catalogs of popular vendors will be available for use in the library. The Warden or Superintendent can make exceptions to this policy.

PPD 5.26 IV(E)(4). While the scope of their challenge to this prison regulation is unclear, it appears that plaintiffs simply allege that it is "facially invalid as it applies to the rejection of catalogs sent via bulk mail." Plaintiffs' objection (document no. 81), "Argument No. 4." They do not appear to challenge that aspect of the PPD which prevents inmates from receiving "bulk mail" that advertises or solicits products or services which inmates are not permitted to receive.[3]

_____

[3] Read literally, the PPD does not preclude inmates from receiving mail order catalogs. Instead, it simply provides that catalogs published by popular vendors will be made available to inmates in the prison library. Nevertheless, the parties have presented their respective arguments as if the PPD specifically

26

At least two federal courts have previously considered and held constitutional prison mail regulations that prohibit inmates from receiving bulk mail — regulations substantially similar to (and arguably more restrictive than) the regulation at issue in this case.  See, e.g., Sheets v. Moore, 97 F.3d 164 (6th Cir. 1996) (rejecting inmate's constitutional challenge to a prison regulation prohibiting inmates from receiving all "free advertising material, fliers, and other bulk rate mail"), cert. denied, 520 U.S. 1122 (1997); Kalasho v. Kapture, 868 F.Supp. 882 (E.D. Mich. 1994) (same).  See also Alcala v. Calderon, No. 95-3329, 1997 WL 446234 (N.D. Cal. July 24, 1997) (holding that prison regulation prohibiting inmates from receiving "junk mail," which was defined as either second or third class mail, was not unconstitutional).

In this case, there is little doubt that the PPD challenged by plaintiffs meets the requirements set forth in Thornburgh, supra, and Turner, supra, particularly in light of the following facts: (1) the NHSP processes an enormous volume of mail each day, see Affidavit of Corporal Louis Currier (testifying that each day, the NHSP processes approximately 1,000 letters and 600

---

prohibits prisoners from receiving such catalogs.  Perhaps this is because prison officials have actually applied the PPD as if it were an outright ban on inmate possession of catalogs.

27

newspapers, magazines, and large envelopes); (2) each individual piece of non-privileged mail must be logged-in, opened, and inspected for contraband – a process requiring substantial prison resources; (3) large mail items such as catalogs can be used to smuggle contraband and/or conceal weapons both into and within the prison; (4) by restricting prisoners' ability to receive a limited category of mail, the PPD serves to reduce the overall quantity of flammable material within the prison cell-blocks and limit the means by which contraband might be smuggled into and within the prison; and (5) the policy specifically provides an alternative means by which inmates may view the restricted materials, by providing that "copies of popular mail order catalogs will be kept in the library."

Extensive discussion of this issue and/or a painstaking and detailed recounting of how the challenged PPD meets each element of the test set forth in Turner is not necessary. The court certainly appreciates that no bright line rule determines whether a prison regulation that infringes upon inmates' constitutionally protected rights is, nevertheless, constitutional; each situation must be evaluated on its own merits. But, the facts and circumstances presented in this case are sufficiently similar to

those presented in <u>Sheets</u>, <u>supra</u>, and <u>Kalasho</u>, <u>supra</u>, that the court adopts the reasoning set forth in those opinions.

In short, to the extent the PPD precludes inmates from receiving certain types of mail order catalogs delivered by "bulk mail," it does not unconstitutionally abridge plaintiffs' First Amendment rights because: (1) there is a valid, rational connection between the policy and the legitimate governmental interests advanced as justification for it; (2) there are alternative means by which prisoners might exercise the right infringed (e.g., ask that the library acquire desired mail order catalogs; request companies which normally communicate with inmates through the use of bulk mail to send such material by first class mail; pre-pay the costs associated with having bulk mail and catalogs delivered by first class mail,[4] etc.); (3) accommodating the asserted constitutional right would have a

_____

    [4]    Of course, one might argue that the means by which mail is delivered to inmates should be of little practical or constitutional significance.  However, by restricting inmate access to a limited category of third class mail, the prison can substantially reduce the overall volume of incoming mail, the resources required to inspect it, and, in particular, the means by which contraband might be smuggled into and within the facility.  Nevertheless, if it were to permit inmates to acquire mail order catalogs by <u>first class</u> mail, the prison might limit that category of mail to only those items which the inmates have a sincere interest in receiving, thereby eliminating materials indiscriminately mailed to a broad cross-section of the public and in which the inmates have no particular interest.

29

substantial negative impact on the allocation of prison resources generally and would likely contribute to an overall reduction of prison security by, for example, adding substantially to the volume of mail which must be inspected each day, by increasing the risk of contraband being smuggled into and within the prison, etc. See, e.g., Kalasho, 882 F.Supp. at 888; and, finally, (4) the policy is not an "exaggerated response" to the prison's legitimate concerns.

For the foregoing reasons, and for the reasons set forth in Sheets, supra, and Kalasho, supra, the challenged aspects of the PPD pass constitutional muster. See also Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 130-31 (1977) (holding that "First Amendment speech rights are barely implicated in this case" because only bulk mailings were at issue, not "mail rights" themselves and observing that, notwithstanding the provisions of the challenged prison regulation, there were reasonable alternative methods by which the inmates could exercise their First Amendment rights).

D. Qualified Immunity as to Plaintiffs' Claims Concerning the Treatment of Mail Order Catalogs.

Even if plaintiffs could somehow demonstrate that the challenged prison regulation concerning mail order catalogs

amounts to an unconstitutional intrusion upon their First Amendment rights (which they have not), defendants would still be entitled to the protections afforded by qualified immunity. The existence of opinions such as Sheets and Kalasho demonstrate that, at best, the law on this point is unsettled; one certainly cannot conclude that inmates' constitutional right to nearly unrestricted access to mail order catalogs is "clearly established." As the Court of Appeals for the Six Circuit observed in Sheets, "If federal district judges could reasonably disagree over the constitutionality of the regulation, then it can fairly be said that a reasonable official would not have known that his conduct violated a clearly established right." Sheets, 97 F.3d at 168. See also Joyce v. Town of Tewksbury, Mass., 112 F.3d 19, 23 (1st Cir. 1997) (Torruella, C.J., concurring) ("One would think that a [constitutionally protected] right cannot possibly be 'clearly established' from the point of view of the [defendants] when a total of seven judges, including the district court, the appellate panel, and finally the en banc First Circuit court, are themselves in disagreement as to the precise scope of that right."); Scalice v. Davies, No. 92-36909, 1994 WL 192430 (9th Cir. 1994) ("Even assuming that a policy prohibiting catalogs might violate a prisoner's First Amendment rights, we cannot say that such rights are so clearly established

that [the inmate's] action survives defendant's qualified immunity defense.").

E.  Lack of Notice to Inmates of Rejections under the PPD.

At first glance, plaintiffs' assertion that their constitutional rights have been violated, insofar as they say the PPD permits defendants to reject mail order catalogs without notifying inmates of such rejections, would seem to present a closer question. To be sure, the Supreme Court has held that "the decision to censor or withhold delivery" of first class mail "must be accompanied by minimum procedural safeguards." Procunier v. Martinez, 416 U.S. 396, 417-18 (1974), overruled in part by, Abbott, 490 U.S. 401 (1989). The Martinez court, however, expressly declined to extend that holding to the case of mass mailings. Id., at 408 n.11. And, at least one court that has addressed this specific issue (i.e., constitutional challenges to prison policies that do not require notification to inmates when bulk mail is discarded) has concluded that such policies do not unconstitutionally abridge the inmates' First Amendment rights. See Alcala, supra.

Critically, however, the regulation at issue in this case provides that prison officials are required to notify inmates

32

whenever <u>any</u> mail is rejected, destroyed, or returned to sender. <u>See</u> PPD 5.26 IV(M). Such a notification requirement is certainly consistent with the "procedural safeguards" that must accompany any decision to "censor or withhold delivery of a particular letter," as discussed in <u>Martinez</u>.[5]

A plain reading of that regulation suggests that whenever prison officials determine that mail will not be delivered to an inmate because it is a mail order catalog, prison officials must notify the addressee of that decision. Thus, the policy itself does not unlawfully abridge plaintiffs' constitutional rights. Whether there have been isolated occasions on which prison officials failed to comply with the requirements of that policy is, of course, a different question. And, to the extent plaintiffs assert a due process violation stemming from the misdirection or destruction of their personal property, they already have an adequate state remedy and, therefore, no federal

---

[5] Of course, it is entirely unclear whether such procedural safeguards are constitutionally mandated when a prison administrator declines, for legitimate penological reasons, to deliver bulk mail "requested by an individual inmate but targeted to a general audience." <u>Abbott</u>, 490 U.S. at 412. As the <u>Abbott</u> court recognized, "the logic of our analyses in <u>Martinez</u> and <u>Turner</u> requires that <u>Martinez</u> be limited to regulations concerning <u>outgoing</u> <u>correspondence</u>." <u>Id.</u>, at 413 (emphasis supplied). <u>Martinez</u> does not, therefore, apply to <u>incoming</u> <u>mass mailings</u> directed to a vast general audience, of which the inmate simply happens to be a member.

cause of action.  See Discussion of plaintiffs' due process

claims, infra.[6]


IV.  Count Four - Deprivation of Property Without Due Process.

In Count Four of their complaint, plaintiffs advance the

following claim:

> The Defendants, in damaging, losing, stealing and
> seizing Plaintiffs' property without returning it have
> violated the Plaintiffs' property rights and State of
> New Hampshire laws, including larceny and illegal
> conversion laws.

Complaint, para. 51 (emphasis supplied).  As to their asserted

private causes of action for alleged violations of New Hampshire

criminal statutes (to the extent such claims actually exist),

those state law claims were dismissed by prior order.  Thus, all

that remains of Count Four is any viable federal claim.

---

[6]     To the extent plaintiffs claim that their First
Amendment rights, rather than their due process rights, were
violated when prison officials allegedly discarded bulk mail
without notifying them of that action, defendants would be
entitled to qualified immunity.  The Supreme Court's express
declination to extend its holding in Martinez to mass mailings,
and the existence of opinions such as Alcala, make clear that, at
a minimum, the law on this issue is unsettled.  Consequently,
plaintiffs could not establish that defendants acted knowing that
their conduct was likely to violate plaintiffs' clearly
established constitutional rights.

34

Read broadly and liberally, Count Four arguably asserts a claim for deprivation of property without due process. The specific instances of alleged wrongful conduct on the part of defendants giving rise to that claim are set forth in the various submissions by plaintiffs, most notably their affidavits and responses to interrogatories propounded by defendants. The vast majority of those claims relate to particular magazines that were not delivered to one or more plaintiffs because they violated the PPD banning graphic depictions of homosexual conduct.

The specific property deprivations giving rise to the constitutional violations alleged in Count Four are as follows:

1.   Plaintiff Marc Adams claims that he did not receive several copies of Gallery magazine, a publication to which he claims to have subscribed and which contains, among other things, photographic depictions of nude women. As a result, he claims to have sustained damages equal to the value of the magazines he has been denied and/or the total cost of his annual subscription to Gallery magazine (which is apparently non-refundable). He also asserts that on at least one occasion his copy of Gallery magazine was misdirected and either never arrived at his cell or was delayed. Finally, he claims that one or more letters from his sister were not delivered to him and were either returned to her or destroyed.

2.   Plaintiff John Clancy claims that he was denied copies of several publications, including Asian Beauties, Asian Babes, Gallery, and an "unknown" publication, a brochure, and a catalog. He acknowledges, however, that the disclosed publications were rejected pursuant to the PPD provisions restricting prisoner access to

35

certain categories of graphic sexual material.  <u>See</u>
Affidavit of John Clancy.

3.  In response to interrogatories propounded by
    defendants, plaintiff Charles Drenas asserted that he
    had been denied "no publications, documents, or any
    other written or printed material" within the
    applicable limitations period.[7]

4.  Plaintiff William Lepine asserts that he has been
    denied only one publication because of its explicit
    sexual content within the pertinent limitations period:
    the February, 1998, issue of Playboy Magazine.

5.  Plaintiff Francis Peirce claims that he was denied
    several issues of Gallery magazine, certain letters
    which contained photographs from "Reaching Out"
    magazine, and several issues of "Spin Magazine," the
    denial of which he appears to have appealed to the
    Warden.  He also claims that on several specific
    instances his personal mail was mishandled, wrongfully
    opened, damaged, or misdirected.

6.  At the time he responded to the interrogatories
    propounded by defendants, plaintiff Steven Roy said he
    had no claims that the mailroom had mishandled his
    personal mail or that he had wrongfully been denied
    access to any sexually oriented publications.
    Subsequently, however, Roy claimed that he was denied a
    mail order catalog from Edward R. Hamilton.  <u>See</u>
    Affidavit of Steven Roy.

7.  Plaintiff Karl Sagar claims that he has been denied
    several issues of Gallery magazine, and says that
    several "paperback adult reading novels" were rejected
    and returned to sender at his expense.

8.  Plaintiff Darren Starr claims that he was denied a
    brochure for Brianwood Corp., a publication that
    apparently advertises books featuring bondage.  He also

---

[7]     The applicable limitations period in this case is three
years.  Accordingly, plaintiffs' may seek recourse for any
alleged injuries occurring on or after February 18, 1994, or
three years prior to the filing of their complaint.

complains that on one occasion a letter he addressed to
the Warden was delivered instead to the Unit Manager
(after he was informed that inmates must communicate
within the prison by inmate request slip, rather than
through the United States Postal Service). Finally,
Starr claims that the library has not provided him
access to certain mail order catalogs he wishes to
review (i.e., L.L. Bean and Salmon Falls).

See generally Plaintiffs' responses to interrogatories and the various affidavits submitted by plaintiffs in opposition to defendants' motion for summary judgment.

A.    Withholding, Loss, or Destruction of Publications.

At best, plaintiffs' due process claims relate to the loss or destruction of their personal property (e.g., magazines and catalogs), for which there is an adequate state remedy: a claim against the State pursuant to New Hampshire Revised Statutes Annotated ch. 541-B. That statute provides a meaningful and adequate avenue by which plaintiffs might seek and, if appropriate, receive compensation for their alleged losses. Simply stated, the claims asserting deprivations of property without due process and just compensation raised in Count Four are not of constitutional magnitude. See Daniels v. Williams, 474 U.S. 327, 332 (1986) ("We think that the actions of prison

37

custodians in . . . mislaying an inmate's property are quite remote from the concerns just discussed. Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law."); Hudson v. Palmer, 468 U.S. 517, 533 (1984) ("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."). See also Parratt v. Taylor, 451 U.S. 527 (1981), overruled in part by, Daniels, 474 U.S. 327 (1986).

B.   Qualified Immunity as to Count Four.

As with Count Two, even if plaintiffs could demonstrate that their procedural due process rights had been violated, defendants would be entitled to qualified immunity.

Plaintiffs' complaint arguably challenges not only the PPD, but also defendants' enforcement of the PPD in certain circumstances, such as their decision to ban certain issues of Playboy and Gallery magazines. The court (Muirhead, M.J.) has,

38

however, reviewed those publications and found that each does, in fact, portray "what the [prison publications] review committee stated it portrays - lesbianism, sadomasochism, or prostitution." Report and Recommendation, February 10, 1998 (document no. 45) at 2. Thus, because the referenced sexually-oriented materials fall within the scope of the prison's constitutionally permissible regulation governing inmates' access to such materials, defendants would plainly be entitled to qualified immunity as to each claim that the denial of a specific magazine violated plaintiffs' constitutionally protected rights.

While plaintiffs' constitutionally protected right to receive mail is, in the abstract, clearly established, so too is the authority of prison officials to reasonably restrict that right under certain circumstances. Here, as noted above, the prison's policy restricting inmate access to publications that contain certain types of graphic, sexually oriented materials is constitutionally sound. But more to the point for purposes of analyzing defendants' entitlement to qualified immunity, defendants neither knew nor should they have known that their decision to enforce the provisions of that policy and prohibit plaintiffs from obtaining specific materials which plainly fall within the scope of the PPD likely violated plaintiffs' clearly

39

established constitutional rights. For example, plaintiffs have failed to demonstrate (nor is it likely that they could demonstrate) that defendants knew or should have known that denying them access to, say, the April 1997 issue of Asian Beauties or the December 1997 issue of Gallery magazine, likely violated plaintiffs' clearly established First Amendment rights. Consequently, even if plaintiffs were to have demonstrated that their constitutional rights were actually violated when they were denied access to, for example, a specific issue of Gallery magazine, defendants would be still entitled to the protections afforded by qualified immunity.

C.   Plaintiffs' Remaining Claims in Count 4.

To the extent plaintiffs assert that, on certain occasions, particular pieces of non-sexually oriented personal mail were mishandled or misdirected, nothing in the record suggests that such alleged incidents involved anything more than occasional administrative mistakes, committed in the course of handling more that 1,200 individual pieces of mail daily. See, e.g., Affidavit of plaintiff John Clancy ("I do not contend any specific violation on the part of NHSP mailroom personnel. On several occasions I have received legal mail which was opened without my being present, but I believe this was done in error and not with

40

malice. I believe the mailroom personnel have acted in good faith throughout."). At most, therefore, plaintiffs might arguably have a state law claim for negligence. Such a claim does not, however, implicate constitutional notions of due process. See, e.g., Daniels v. Williams, 474 U.S. at 328 ("We conclude that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."). See also Gardner v. Howard, 109 F.3d 427, 431 (8th Cir. 1997) ("We have never held or suggested that an isolated, inadvertent instance of opening incoming confidential legal mail will support a § 1983 damages action."); Smith v. Maschner, 899 F.2d 940, 944 (10th Cir. 1990) (holding that isolated incidents involving the inadvertent opening of an inmate's privileged mail, "without any evidence of improper motive or resulting interference with [his] right to counsel or to access to the courts, does not give rise to a constitutional violation"); Stevenson v. Koskey, 877 F.2d 1435 (9th Cir. 1989) (holding that defendant's negligent opening of inmate's privileged mail did not amount to a violation of the inmate's constitutionally protected rights); Bagguley v. Barr, 893 F.Supp. 967, 972-73 (D.Kan. 1995) (same); Haston v. Galetka, 799 F.Supp. 1129, 1132 (D. Utah 1992) (holding that in the absence of any evidence suggesting a pattern of deliberate

41

improper behavior by prison officials in opening his privileged mail, inmate failed to state a viable § 1983 claim for violations of his First Amendment rights).

Finally, to the extent that plaintiffs claim that they have been wrongfully denied access to particular mail order catalogs, they are apparently free to request that prison officials obtain such catalogs (provided, of course, they are not properly excludable under the PPD) and make them available to inmates in the prison library. Should prison officials refuse such a request, inmates can pursue available post-deprivation administrative remedies. See generally Maschner, 899 F.2d at 944 (concluding that an inmate's "complaint about undelivered catalogues fails to raise an issue of constitutional magnitude"). See also Allen v. Deland, No. 94-4067, 1994 WL 593917 (10th Cir. 1994) (affirming district court's granting of summary judgment to prison officials charged with violating inmate's First Amendment rights for having prevented him from receiving mail order catalogs).

## Conclusion

It is beyond question that "though his rights may be diminished by the needs and exigencies of the institutional

42

environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." Wolff v. McDonnell, 418 U.S. at 555. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. at 84. Thus, "when a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." Procunier v. Martinez, 416 U.S. at 405-06.

Nevertheless, in discharging that duty, courts must be particularly deferential to administrative decisions made by those charged with operating state and federal prisons.

> [C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform . . . the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.

Tuner v. Safley, 482 U.S. at 85 (citation and internal quotation marks omitted). See also Bell v. Wolfish, 441 U.S. 520, 547 (1979) (holding that "prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). Thus, the Supreme Court has frequently reiterated "the familiar proposition that lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Pell v. Procunier, 417 U.S. 817, 822 (1974) (citation and internal quotation marks omitted).

Consequently, in the context of First Amendment challenges to prison regulations, inmates retain only those rights which are not inconsistent with their status as prisoners or with the legitimate penological goals of the correctional institution. Id. See also Bell v. Wolfish, 441 U.S. at 545-48; Jones v. North Carolina Prisoners' Union, 433 U.S. at 129-30. Applying the appropriately deferential standard of review to the prison mail regulations at issue in this case, the court concludes that the NHSP Policy and Procedure Directive precluding inmates from

possessing graphic depictions of homosexual conduct (including sexual contact between women) does not unconstitutionally abridge plaintiffs' First Amendment rights. Similarly, the NHSP policy which limits inmates' access to mail order catalogs also withstands constitutional scrutiny. Moreover, even if plaintiffs were to have established that their constitutional rights had been unlawfully infringed by either (or both) of those policies, defendants would plainly be entitled to the protections afforded by qualified immunity.

To be sure, one might reasonably question the seemingly odd distinctions that appear to underlie the challenged aspects of the PPD. After all, the reasons given by prison authorities for prohibiting inmate access to graphic depictions of homosexual sexual contact would seem to apply with equal force to graphic depictions of heterosexual sexual activity. Defendants have not explained why graphic lesbian materials should pose a significantly greater risk than graphic heterosexual materials. But, the basic question raised by plaintiffs is whether prison authorities can lawfully decide to draw the line where they have, and the answer is that they can. Indeed, they probably could have lawfully drawn the line even more restrictively, as other penal institutions have done.

45

Finally, the record demonstrates that defendants are entitled to judgment as a matter of law with regard to plaintiffs' due process claims.  And, again, even if plaintiffs were to have demonstrated that their due process rights had been violated, defendants would plainly be entitled to qualified immunity.

For the foregoing reasons, defendants' motion for summary judgment as to all remaining counts in plaintiffs' complaint (document no. 78) is granted.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

September 30, 1999

cc:   William E. Lepine
      Steven Roy
      John Clancy
      Francis Pierce, Jr.
      Marc Adams
      Karl Sagar
      Darren F. Starr
      Charles W. Drenas, Jr.
      Nancy J. Smith, Esq.

46